**Valarie GOGUEN, Petitioner-Appellee,**

v.

**Joseph SMITH, Sheriff of Worcester County, Respondent-Appellant.**

**No. 72–1204.**

United States Court of Appeals, First Circuit.

Heard Sept. 7, 1972.

Decided Dec. 14, 1972.

Charles E. Chase, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Criminal Division, were on brief, for appellant.

Evan T. Lawson, Boston, Mass., with whom C. Michael Malm, Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and HAMLEY,[*] Senior Circuit Judge.

COFFIN, Chief Judge.

Appellee was sentenced to six months in the House of Correction after having been convicted by a jury in a Massachusetts Superior Court[1] for "publicly treat[ing] contemptuously the flag of the United States", in violation of Mass.Gen.Laws ch. 264 § 5.[2] The treatment found contemptuous consisted of appellee appearing in the business district of Leominster, displaying a small cloth American flag sewn to his blue jeans on the area covering his left buttock. When a police officer questioned appellee, persons with whom appellee was standing were amused. Appellee was arrested the day after this incident. The Massachusetts Supreme Judicial Court affirmed the conviction in a rescript opinion, Commonwealth v. Goguen, 1972 Mass.Adv.Sh. 303, 279 N.E.2d 666, finding the statute not vague as applied to appellee, whatever might be the uncertainties in other circumstances, and neither a facial nor "as applied" restraint upon freedom of speech. Appellee then petitioned for a writ of habeas corpus in the federal district court, which issued the writ after finding that the statute was both vague, in violation of the Fourteenth Amendment, and overbroad, in violation of the First Amendment. Goguen v. Smith, 343 F.Supp. 161 (D.Mass.1972). The Commonwealth appeals.

The Commonwealth first contends that the questions of facial vagueness

---

[*] Of the Ninth Circuit, sitting by designation.

1. A prior trial before a Massachusetts District Court judge resulted in a finding of guilty and imposition of a one-year jail sentence. Thereupon, appellee exercised his right to a *de novo* jury trial.

2. "Whoever publicly mutilates, tramples upon, defaces or treats contemptuously the flag of the United States . . . shall be punished by a fine of not less than ten nor more than one hundred dollars or by imprisonment for not more than one year, or both . . . . ."

This statute, first enacted in 1899, remained the same insofar as its operative "desecration words" are concerned, until some time after the events here at issue took place.

and overbreadth should not be considered, placing principal reliance on the well-known abstinence prescription of United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960) that "[one] to whom application of a statute is constitutional will not ·be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional," [3] and on Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Secondly, it specifically defends against the vagueness charge by pointing out that the statutory words "spell out design" and "describe conduct that affects the physical integrity of a flag of the United States". Finally, the Commonwealth supports its law against the overbreadth attack by arguing that the statutory "desecration words", being aimed at "protecting . . . physical integrity" are not speech-oriented; but that, if appellee be assumed to have been engaging in symbolic speech, the Commonwealth was furthering a substantial government interest, within its power, unrelated to suppression of expression, and no greater than essential to further that interest, thus meeting the requirements of United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

██ While the facts in this case are clear and simple, the legal issues are complex. This is so because concepts of vagueness and overbreadth are fraternal, not identical twins, having affinity but separate identities and purposes; because the preliminary question, "When may one complain?", requires a different analysis as to each concept; and be-

cause, as to the First Amendment challenge .of overbreadth, we confront the question which Mr. Justice Harlan noted had been "pretermitted" in clearer cases, i. e., whether wearing a flag is symbolic speech. Cowgill v. California, 396 U.S. 371, 372, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970) (concurring opinion). We shall order our analysis first by examining if appellee's non-First Amendment attack on the statute's facial vagueness may properly be considered, and then by proceeding to the merits of that attack. We shall then assess whether it is appropriate to subject the statute to a First Amendment overbreadth test, and continue with the detailed inquiries required by such a test. So, while the subject matter of this case is seat-of-the-pants, our analysis cannot be.

### Vagueness in a Non-First Amendment Context

We first approach this case on the assumption that there are no First Amendment problems inhering in the statute or in appellee's conduct. The threshold question then becomes, whether appellee's conduct and the proscriptions of the statute are such that it is appropriate for a court to consider his facial challenge, in addition to his allegation that the law is vague as applied to him. The Commonwealth assumes there was no vagueness as applied to appellee, as did the Supreme Judicial Court. The unarticulated premise is that, whether or not the statute may be capable of unconstitutional applications in other situations, it is not vague as to one who sews a flag to the seat of his pants.[4]

██ Assuming, however, that the statute clearly covers appellee's conduct,

---

3. *Raines* was not a case involving vagueness, but rather an overbreadth attack in the sense that the statute was allegedly susceptible of unconstitutional applications to third persons. Many of the cases cited in *Raines* were similarly overbreadth cases, though at least United States v. Wurzbach, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930) clearly refers to vagueness claims.

4. Even if we were to accept the Commonwealth's interpretation in its brief that the statute proscribes only conduct affecting "the physical integrity of a flag", and were to assume that, so limited, it could validly be applied, we are not so sure that sewing a flag to a background clearly affects "physical integrity."

we must determine whether a court may hear appellee's complaint that the statute is facially unconstitutional because others would not know whether their proposed conduct would constitute contemptuous treatment. Before *Raines*, an impressive series of cases considered vagueness attacks by looking solely to the text of the statute without examining the offender's conduct,[5] some cases involving conduct clearly covered by a statute.[6] *Raines*, while stating that generally a person may not plead facial unconstitutionality of a statute that is constitutional as to him, noted none of these cases although it recognized a sizeable list of exceptions to its broad principle. Two of these exceptions are relevant to our present inquiry since their rationale supports the instant facial attack. Thus, where a statute has already been declared unconstitutional in a large number of its intended applications, and it appears that it was not intended to stand as valid in the few remaining fortuitous situations to which it might apply, Butts v. Merchants' & Miners' Transportation Co., 230 U.S. 126, 33 S. Ct. 964, 57 L.Ed. 1422 (1913); or where a state court has declared valid one provision or application of a statute which is inextricably tied up with an invalid one, Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924) —in such circumstances the broad constitutional challenge may be mounted.[7] We read these exceptions as not depending upon the historic fortuity that a statute has already been subjected to such holdings but as depending upon the probability of such holdings invited by the wording of the statute. From the failure of *Raines* to cite the vagueness cases to which we have referred and in the light of the thrust of the foregoing two exceptions, we think the sense of the doctrine is that if the nature of a party's conduct is not so dissimilar from other behavior sought to be proscribed by a statute, such that an interpretation distinguishing his behavior from that of others would not provide more certain notice to potential offenders and would also seem unwarranted in the light of a legislative determination to cover all such activities, then a void-for-vagueness challenge allows a court to rule on the facial constitutionality of that statute. *See* R. Sedler, Standing to Assert Constitutional Jus Tertii in The Supreme Court, 71 Yale L.J. 599, 608 (1962).

5. United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921); Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); United States v. Spector, 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863 (1952).

6. Czarra v. Board of Medical Supervisors, 25 App.D.C. 443, 453 (1905), (cited in *Lanzetta, see* n. 3); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L. Ed. 1495 (1944); Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).

7. The other exceptions are "in the rarest of cases" where the Court determines that Congress would have wanted the statute to stand only if it could do so in all of its applications, clearly inapplicable to the state statute here, *but see* discussion *infra*; or where freedom of speech would be inhibited as to others, Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), a situation we have assumed does not exist here, *but see* discussion *infra*; or where the Court did consider the rights of third persons not parties to the litigation but that were impaired thereby because these persons had no effective way to preserve those rights themselves. N. A. A. C. P. v. Alabama, 357 U.S. 449, 459–460, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), *but see* discussion *infra*; or where, as a result of the litigation, a criminal statute would be necessarily revised and consequently would fail to give intelligible warning of the conduct it prohibited, United States v. Reese, 92 U.S. 214, 219–220, 23 L.Ed. 563 (1875).

We are confirmed in this view by recent decisions of the Supreme Court.[8] In Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), numerous parties who had been prosecuted under a city vagrancy ordinance prevailed in their contentions that the law was void for vagueness. Among those permitted to challenge the ordinance on its face was a defendant who had been charged with "disorderly conduct—resisting arrest with violence". Similarly, in *Colten* the Court entertained a void-for-vagueness claim against a state "disorderly conduct—refusing to disperse" statute which clearly applied to the offender. Although the claim was rejected, the Court specifically agreed with the state court determination that the law was not facially unconstitutional since " 'citizens who desire to obey the statute will have no difficulty in understanding it . . . .' Colten v. Commonwealth, 467 S.W.2d [374] at 378." *Colten, supra* 407 U.S. at 110, 92 S.Ct. at 1957. In Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court similarly reached the merits of a facial challenge to an anti-noise ordinance, finding it not to be vague. The attack was allowed even though the defendants admitted that the ordinance was not uncertain as applied to their conduct. It is apparent that the conduct punished in each of these three cases was precisely the type of activity which the statute sought to punish.[9] Assuming the statute was vague as applied in *Papachristou,* the Court must have recognized that it could not be interpreted so as to provide more certain notice to other potential offenders and hence there was no reason to abstain from a ruling on the claim of facial unconstitutionality. In *Colten* and *Grayned,* it was clear that failure to find vagueness as to the particular violators with which the Court was concerned would amount to a clean constitutional bill of health in all but perhaps a small number of peripheral cases, and hence it made no sense to perpetuate any doubts as to facial constitutionality in light of the void-for-vagueness challenge pressed in the case before the Court.[10]

8. Although we focus upon these three recent cases, others similarly corroborate our decision. In Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966) [cited with approval in California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), n. 5], involving a vagueness challenge to a state liquor law, the court was unconcerned with specific applications of the law to the parties and stated that "our concern . . . is only with the constitutionality of [the statute] on its face". *Id.* 384 U.S. at 41, 86 S.Ct. at 1259. *See also* United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); Gesicki v. Oswald, 336 F.Supp. 371 (S.D.N.Y.1971), aff'd, 406 U.S. 913, 92 S.Ct. 1773, 32 L.Ed.2d 113 (1972); *but cf.* Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971).

9. The Court did not rest its decisions in these cases on the *Raines* exception allowing void-for-vagueness attacks on prohibitions affecting First Amendment rights, *supra* n. 7. In fact, it rejected allegations that the laws in *Colten* and *Grayned* infringed any right of assembly or speech.

10. A somewhat anomalous case, United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), seems to adopt an approach out of line with the cases we have analyzed. A federal act prohibiting sales at "unreasonably low prices" was attacked as void on its face. The Court's statements seem self contradictory, unless explained by the context of the case. "It is true that a statute attacked as vague must initially be examined 'on its face,' but it does not follow that a readily discernible dividing line can always be drawn, with statutes falling neatly into one of the two categories of 'valid' or 'invalid' solely on the basis of such an examination." *Id.* at 32, 83 S.Ct. at 597. The Court then stated that it would "consider the vagueness attack solely in relation to whether the statute sufficiently warned [the offenders] . . . ." *Id.* at 33, 83 S.Ct. at 598. After examining the past applications of the act and the violators' conduct, the Court noted the difference between an economic regulation case like the one before it and First Amendment cases. It concluded that "[w]e are thus permitted to consider the warning provided by [the statute] not only in terms of the statute 'on its

■ Appellee's conduct in the case confronting us consisted of wearing an American flag on the seat of his pants. It is little different from other kinds of alleged contemptuous conduct sought to be covered by Mass.Gen.Laws ch. 264, § 5. It is located within an ill-defined middle ground between specifically mentioned activities like mutilation or defacing, and unmentioned behavior like exhibiting a clenched fist or making obscene gestures. We do not see how the statute could be so interpreted as to cover appellee and exclude others who place the flag in odd positions, or in conjunction with deprecatory symbols, gestures, or slogans, or who merely display it while acting out or speaking that which many Americans might consider obnoxious.[11] Additionally, the statute's words make it clear that the Massachusetts legislature did not intend to confine maltreaters of the flag to those who mutilate, trample upon, or deface the flag but meant to cover separately other types of contemptuous treatment. We therefore conclude that resolution of appellee's challenge to the statute as applied to him necessarily adjudicates the statute's facial constitutionality, and we

proceed to address appellee's vagueness argument.

■ There are well-established principles underlying the application of the vagueness doctrine. First, and perhaps the essence of the due process clause of the Fourteenth Amendment, is the rule that all persons "are entitled to be informed as to what the state commands or forbids." *Papachristou, supra,* 405 U.S. at 162, 92 S.Ct. at 843. This fundamental requirement is such that a "conviction under a criminal enactment which does not give adequate notice that the conduct charged is prohibited is violative of due process." *Wright v. Georgia,* 373 U.S. 284, 293, 83 S.Ct. 1240, 1246, 10 L.Ed.2d 349 (1963). We realize that words which may appear at first blush too vague, are, when examined at length and in their context, often found to comport with the requirement that they give adequate notice. *Jordan v. De George,* 341 U.S. 223, 231–232, 71 S.Ct. 703, 95 L.Ed. 886 (1951) n. 15. Many of these apparently vague statutes are made more definite for reasons classified in *Connally, supra,* 269 U.S. at 391–392, 46 S.Ct. at 127 [12] and other

face' but also in the light of the conduct to which it is applied." *Id.* at 36, 83 S. Ct. at 600. Three dissenters pointed out the inconsistency between *National Dairy* and *Cohen Grocery.* We cannot believe that a long line of cases was overruled *sub silentio* by *National Dairy,* especially since *Papachristou, Grayned,* and *Colten* and the cases cited in n. 8, *supra,* permitted facial attacks where there was no mention of First Amendment rights or where they were minuscule. Rather, we read *National Dairy* to say that a standard such as "unreasonableness" in the economic sphere of activity cannot be scrutinized in the abstract, but some reference to a factual setting must be made. Apparently the facts in *National Dairy* were like many others to which the Robinson-Patman Act applied and hence furnished some basis for an examination of the terms of that law. The case can therefore be taken as holding, in effect, that the Robinson-Patman Act is not void for vagueness as a constitutional flaw. *Cf.* 32 G.W.L.Rev. 126 (1963).

11. *See* State v. Bunch, 26 Ohio Misc. 161, 54 Ohio Ops.2d 354, 268 N.E.2d 831 (1970) (using flag as blanket on ground) ; State v. Sinniger, 486 P.2d 1303 (Ct. of App., Or.1971) (using flag as car seat cover) ; Commonwealth v. Lorenc, 220 Pa. Super. 64, 281 A.2d 743 (1971) (flying Communist flag above United States flag) ; People v. Verch, 63 Misc.2d 477, 311 N.Y.S.2d 637 (1970) (painting brownish-red a United States flag). Such cases illustrate the fact that arguably surprising applications of such a statute are not merely in the realm of imagination.

12. "[T]hey employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, [cites omitted], or a well-settled common-law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, [cites omitted], or, as broadly stated by Mr. Chief Justice White in United States v. Cohen Grocery Co., 255 U.S. 81, 92, [41 S.Ct. 298, 301, 65 L.Ed. 516,] 'that, for reasons found to

cases.[13] While the examples stated in those cases are not exhaustive, they do provide a sharp contrast with the case before us in which none of these factors is present to give certainty of meaning to the statute. Instead, we have a law which forbids "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally, supra* 269 U.S. at 391, 46 S.Ct. at 127. This violates the underlying principle that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); *Lanzetta, supra* 306 U.S. at 453, 59 S.Ct. 618. The district court properly found, for example, that it is not clear "to what extent [the statute] prohibit[s] any public deviation from formal flag etiquette." *Goguen v. Smith, supra* 343 F.Supp. at 167.

The possibilities of deviation which pose problems of legal forecasting are numerous: waving a flag during a speech critical of foreign or domestic policy; holding a flag while making a face or a contemptuous gesture; climaxing a speech by crumpling a flag; spitting in the direction of a flag—at a safe distance, and at an unsafe distance; wrapping a flag around oneself; displaying the flag against a background, surrounded with derogatory and condemnatory symbols and slogans; the sewing of a flag to a larger patriotic banner, to the jacket of a bemedalled veteran, to a sleeve of a Boy Scout leader, or even to the back of a motorcyclist's windbreaker. Yet any or none of these actions could be interpreted as "treats contemptuously". Since persons in Leominster's business district may have views of what constitutes contemptuous treatment of the flag differing from those of persons in Cambridge's Harvard Square, it is important that the statute give all persons definite notice of what acts are prohibited.

Secondly, it is also without contradiction that law enforcement authorities must be given sufficient guidelines as to prohibited offenses if they are to act properly, often in situations where emotions are high and a quick evaluation of the circumstances is necessary to effectuate constitutional arrests. "Lawmaking [must] not [be] entrusted to the moment-to-moment judgment of the policeman on his beat." *Gregory v. City of Chicago,* 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring). The statute before us fails to aid even a good faith attempt to enforce it, making us especially fearful of a "zealous effort by [officers] to discharge their duty [by] establish[ing] a standard of their own to be used as a basis to render the [statute] possible of execution". *Cohen Grocery, supra* 255 U.S. at 91, 41 S.Ct. at 300. Additionally, we must note that the generalized "crime" here lends itself to kinds of contemporary confrontations when "those convicted may be punished for no more than vindicating affronts to police authority." *Papachristou, supra* 405 U.S. at 166–167, 92 S.Ct. at 846. Moreover, the "unfettered discretion [which the statute] places in the hands of the [city] police", *id.* at 168, 92 S.Ct. at 846, and

result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.'" *See also Cline, supra,* 274 U.S. at 459–460, 47 S.Ct. 681.

13. Additionally, the statute may be part of a wider scheme which supplies certainty to its individual prohibitions, United States v. Spector, 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863 (1952); or in rare cases, judicial precedent and history may continue to provide line-drawing with regard to special types of state laws, Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Lastly, regulatory statutes governing business activities provide greater leeway for legislative selection of words. *National Dairy, supra*; Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L. Ed. 367 (1952); United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L. Ed. 1877 (1947).

prosecutors, and its failure to give adequate notice of the offense may never even be raised in possibly numerous unconstitutional applications because of the practice of dismissing cases by dropping charges before trial. In those situations, there will frequently be little opportunity to vindicate constitutional rights impaired by illegal arrests and detentions, records of which seem to follow even the most innocent throughout their lives.

Thirdly, we believe that any effort to enforce this law "would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of court and jury." *Cohen Grocery, supra* 255 U.S. at 89, 41 S.Ct. at 300. With the recent Supreme Court decisions that state juries in criminal trials may be formed of less than twelve persons, Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and that unanimity is not required for a conviction, Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L. Ed.2d 184 (1972), the danger is greater that personal views of morality or politics or other whimsical notions may infect jury verdicts in the guise of providing certainty to an utterly vague phrase like "treats contemptuously". Thus a claim of facial unconstitutionality for vagueness arguably possesses a somewhat more compelling rationale for adjudication by courts than when there was the safeguard of the unanimity of a twelve-man jury.

We accept the Commonwealth's argument, for the sake of this discussion, that the definition of the terms "treats contemptuously" includes "the feeling with which one regards that which is esteemed mean, vile or worthless". But we would feel most uneasy in compelling defendants to be subjected to what juries might deem "mean, vile, or worthless", words which seem too vague to apply to offenders of Mass.Gen.Laws ch. 264, § 5. The matter is not helped any by the supervisory power of a judge who is given no more certain a standard when called upon to decide if he should dismiss charges against the alleged offender.

The present case cannot be compared to the situation where a person who sees thousands of others illegally crossing a street seeks to escape punishment for commission of a similar wrong. In that situation there are well-defined crossing signals, cross-walks and signs which give all persons adequate notice that they are about to commit an offense. Instead we have the totally different situation where those charged with violation of the statute before us, after having seen unpunished hundreds, perhaps thousands, of citizens with American flags sewn to various parts of their clothes, or flying in frayed condition from radio antennas of automobiles, or used as advertising in store windows, are expected to know that their similar actions—such as sewing a flag to the seat of one's pants—could constitute contemptuous treatment.

■ We conclude that, because "treats contemptuously" gives no sufficient warning to prospective offenders as to the reach of the law, affords law enforcers no clear guide for evaluation of actions, and offers neither judge nor jury any sufficient standards for inclusion and exclusion, the statute is impermissibly vague.

*The First Amendment and Overbreadth*

■ Thus far, we have approached this case with the assumption that the First Amendment is not involved. If it is, our analysis undergoes a considerable change from that which we employed in assessing the vagueness challenge. Our inquiry contains an added dimension—a judicial mandate to protect the favored status of rights to expression and association. Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). To phrase it differently, there is a greater solicitude that courts have, and ought to have, about the fear-inducing

effect of any law which, by its very scope, constitutes a broad-gauged potential sanction against many who would seek to express themselves. So many cases have concerned themselves with this kind of anticipatory and open-ended threat of retaliation that a self-defeating jargon has crept into our jurisprudence—a terminology so brief, and easy, and common that it is all too quickly applied in complex factual settings by a casual reference to "chilling effect". The rubric is in danger of smothering analysis of the reality.

We have viewed the Massachusetts statute under which appellee was punished and have determined that it cuts a swath far beyond the individual defendant whose conduct is sought to be penalized. It is a double-edged sword of Damocles not only menacing the exercise of constitutional freedoms, but also serving to obstruct any future adjudications with regard to unknown, innumerable other individuals who may, because of the breadth of the statute, forego asserting their rights under fear of criminal prosecution and punishment.

■ Before discussing the analysis which led us to this conclusion we note that in light of the constitutional constellation in this area, *Thornhill, supra*, 310 U.S. at 96–98, 60 S.Ct. 736, Coates v. City of Cincinnati, 402 U.S. 611, 616, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), Gooding v. Wilson, 405 U.S. 518, 520–521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), and *Grayned, supra* 408 U.S. at 114, 92 S.Ct. 2294, we are spared any extensive inquiry into the ability of the so-called "hard core" violator to mount an overbreadth challenge to a statute which involves itself with First Amendment rights. The issue is not one of standing,[14] for such violators have suffered sufficient injury to motivate a strong presentation against constitutionality in an adversary context. Whether appellee is "hard core" or not, therefore, we think his overbreadth challenge must be addressed on the merits.

■ Since the overbreadth technique is a powerful weapon which, if improperly used, may contravene principles of federalism or separation of powers, it should be applied gingerly by fed-

14. Although in the past we ourselves have referred to the issue of permitting overbreadth attacks in non-First Amendment areas as involving "standing", Reddy v. United States, 403 F.2d 26 (1st Cir. 1968), cert. denied, 393 U.S. 1085, 89 S. Ct. 871, 21 L.Ed.2d 778 (1969), reh'g denied, 394 U.S. 967, 89 S.Ct. 1303, 22 L. Ed.2d 570 (1969), we note that Supreme Court cases in the First Amendment area indicate that when a claim of overbreadth is made by a person convicted under the statute in question, the proper analysis consists of deciding whether the overbreadth technique yields a conclusion *on the merits* as to whether the statute is constitutional on its face. For a court to find lack of "standing" because it determines that the statute is not "susceptible of application to protected expression", *Gooding, supra*, 405 U.S. at 521, 92 S.Ct. at 1105, is to confuse the merits of the claim with the very different question of "standing". Flast v. Cohen, 392 U.S. 83, 88 S.C. 1942, 20 L.Ed.2d 947 (1968); Younger v. Harris, 401 U.S. 37, 42, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971). It is significant that the word "standing" is not used by either the majorities or minorities in *Coates, Gooding* or *Colten*. Justice White's dissent in *Coates*, quoted in *Gooding*, and referring to *Raines* for the proposition that certain violators "will not be heard to attack the statute" or "permitted to raise its vagueness or unconstitutional overbreadth" as applied to others, may appropriately be thought of as reflecting upon the conclusions in which the policy-generated overbreadth analysis would have resulted as to the nature of the particular statutes involved and *not* upon any constitutional requirements for what is more properly called "standing". "In short, a party's standing to assert overbreadth should be dependent on the same factors which determine whether the statute should be invalidated on its face or not." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 909 (1971). *But cf.* Note, The Void for Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 100–101 (1960); R. Sedler, *supra*. Thus, though the Supreme Court chose to use the standing label in *Grayned, supra* 408 U.S. at 114, 92 S.Ct. 2294, the fact that it surmounted that conceptual barrier without difficulty reinforces our view.

eral courts. We think several self-limiting principles should be imposed by courts upon themselves. In the context of a federal habeas corpus proceeding a state criminal statute should not be ruled unconstitutional on its face as overbroad unless (1) the area affected by it includes a large proportion of First Amendment activities, (2) it possesses the potential for a substantial number of impermissible applications, and (3) immediate and effective excision of the statute's impermissible applications is not foreseeable without continued interruptions of First Amendment freedoms. Note, The First Amendment Overbreadth Doctrine, *supra* at 858, 863. We think that this tripartite test comports well with the proper resolution of frequently conflicting policies of federalism, the role of the courts and the protection of constitutional rights, and is supported by current Supreme Court rulings. N. A. A. C. P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); *Coates; Gooding; Colten; Grayned.* Analysis of the Massachusetts statute before us under these standards requires a conclusion that it is unconstitutional as overbroad.

The first step in this analysis is to examine whether this flag desecration law affects an area of interests which includes a substantial proportion of First Amendment activities. The Commonwealth contends that its statute does not have a "clear nexus with [F]irst [A]mendment rights". It supports its argument in this regard by claiming that the phrase "treats contemptuously" is limited to protecting the physical integrity of the flag, and that consequently the statute punishes only *acts* which constitute contemptuous treatment and are unprotected by the First Amendment. Counsel, at oral argument, alleged that it was the *act* of sewing the flag onto the seat of appellee's trousers which was punished as contemptuous treatment.

There is no evidence to support the Commonwealth's assertions as to the interpretation of Mass.Gen.Laws ch. 264, § 5. We have been unable to find any authoritative Massachusetts state court ruling or Attorney General opinion bearing directly on the interpretation of the phrase here in question.[15] Since "we lack jurisdiction authoritatively to construe state legislation", United States v. Thirty-Seven Photographs, 402 U.S. 363, 369–370, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822 (1971), *Gooding, supra* 405 U.S. at 520, 91 S.Ct. 1686, *Grayned, supra* 408 U.S. at 110, 92 S.Ct. 2294, we must do nothing more than give these words their ordinary dictionary meaning which the state itself quotes. If "treats contemptuously" is "circumscribed" by the state-supplied definition of "the act of contemning, or despising; the feeling with which one regards that which is esteemed mean, vile or worthless; disdain, scorn . . . derision, contumely", Webster's New International Dictionary (Unabridged, 2d ed., 1952), then so broad is this definition that the boundary provided encompasses the complete range of First Amendment freedoms. It subjects individuals to punishment for feelings and words—clearly protected First Amendment activities, Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969)—as well as acts, which are not automatically without protection, Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *O'Brien.*

It is clear that the distinguishing feature of this statute is that it makes criminal not just ill defined acts but rather acts *to the flag of the United States.* It is this distinction which clothes the majority of such acts with First Amendment interests. From time immemorial,

"[T]he flag [has been] the symbol of the nation's power,—the emblem of freedom in its truest, best sense. It

---

15. We note that the Massachusetts legislature is well aware of the presence and effect of this statute, having just recently amended it in 1971. Thus the Commonwealth's arguments on statutory reconstruction here are best addressed to its own courts or its legislature, and not to a federal court.

is not extravagant to say that to all lovers of the country is signifies government resting on the consent of the governed; liberty regulated by law; the protection of the weak against the strong; security against the exercise of arbitrary power; and absolute safety for free institutions against foreign aggression." Halter v. Nebraska, 205 U.S. 34, 43, 27 S.Ct. 419, 422, 51 L.Ed. 696 (1907).

In Joyce v. United States, 147 U.S.App. D.C. 128, 454 F.2d 971, 975–976 (1971), cert. denied, 405 U.S. 969, 92 S.Ct. 1188, 31 L.Ed.2d 242 (1972), Judge MacKinnon's exhaustive history of the flag led him to conclude that it symbolizes our nation's unity and independence, and that

> "[t]hroughout our history as a nation the flag has been our symbol in many wars, foreign and domestic. . . . It has signified our national presence on battleships, airplanes, school houses and army forts . . . . Wherever it flies it signifies the presence of the United States of America."

It is without doubt therefore that the flag has a meaning—a very special meaning—historically associated with support of our form of government and its majestic presence. If it did not speak by itself as a symbol of the United States of America, we doubt that any state would have sought to protect its message from verbal or physical abuse.

When more neutral, utilitarian objects such as draft cards are involved in conduct, courts have to decide when such conduct becomes symbolic speech. *O'Brien.* Symbol, semantically, stems from a Greek word meaning "token" or "sign", Webster's Third International Dictionary, Unabridged at 2316. (G & C Merriam Co., Springfield, Mass., 1966.) More specifically, and important for the instant case, a symbol may constitute "an act, sound or material object having cultural significance and the ca-

pacity to excite or objectify a response." *Id.* Such a primary symbol, likely to be recognized by all who see it, speaks when it is placed in odd positions, conjoined with symbols or words, or made the butt of grimaces, speech, or gestures. We do not have to determine generally at what point that which is often called conduct becomes akin to pure speech.[16] But when the object is a pure symbol, such as the flag in *Halter*, the cross, the Star of David, the crescent, the swastika, the hammer and sickle, the red flag in Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), or black armband in *Tinker*, any individualized activity with regard to it outside of the purely logistical activity of maintaining or storing of it is bound to convey a message of fealty or revulsion and is "closely akin to pure speech". *Id.* 393 U.S. at 505, 89 S.Ct. 733.

■ We have to agree with Judge Walsh that "[I]t is self-evident that most, if not all, conduct associated with the United States flag is symbolic speech. Such conduct is normally engaged in with the intent to express some idea. Further such conduct is invariably successful in communicating the idea." Crosson v. Silver, 319 F.Supp. 1084, 1086 (D.Ariz.1970). *See also* Long Island Vietnam Moratorium Committee v. Cahn, 437 F.2d 344, 349 (2d Cir. 1970); Hodsdon v. Buckson, 310 F. Supp. 528, 533 (D.Del.1970); Thoms v. Smith, 334 F.Supp. 1203, 1208 (D.Conn. 1971). We think that the statute reaches to a large degree conduct of which "the communicative content . . . was beyond dispute". Cowgill v. California, 396 U.S. 371, 372, 90 S.Ct. 613, 614, 24 L.Ed.2d 590 (1970) (Harlan, J., concurring). Although the message may often seem somewhat "inarticulate", as it did to the Massachusetts Supreme Judicial Court and, we add, capable of various interpretations, ranging from misdirected humor, to political

---

16. *Cf.* L. Henckin, Foreword: On Drawing Lines, 82 Harv.L.Rev. 63, 80 (1968); Note, 68 Columbia L.Rev. 1091 (1968);

Denno, Mary Beth Tinker Takes the Constitution to School, 38 Ford.L.Rev. 35 (1968).

criticism, revulsion at society's values, and rejection of any national fealty, we think it clear that communication is the process being engaged in,[17] and that, whatever the reaction of observers might be to many kinds of conduct involving the flag, a substantial proportion of such conduct falls under the heading of First Amendment activities.

Having determined that the Massachusetts law presents an "actual and apparent danger" to symbolic speech which is more that "strained and remote", *Gooding, supra* 405 U.S. at 533, 91 S.Ct. 1686 (Burger, C. J., dissenting), we must utilize the *O'Brien* test, in order to decide whether it additionally possesses the potential for a substantial number of unconstitutional applications. More specifically, the statute may be constitutionally applied only if

"[1] it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to

the suppression of free expression; [4] and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien, supra* 391 U.S. at 377, 88 S. Ct. at 1679.[18]

First, the state contends, and the district court found, that the state has an interest in the preservation of the flag as a symbol of unity on national ideas and purpose. Certainly this is the predominant view of the majority of lower federal courts which have been faced with this question, whether they found the particular flag desecration statutes before them to be constitutional,[19] or unconstitutional for other reasons.[20] State courts have taken a similar attitude.[21] In earlier times the Supreme Court itself stated that a state "may encourage patriotism and love of country among its people" by requiring respect for the flag, *Halter, supra* 205 U.S. at 42, 27 S. Ct. 419, and more recently at least four Justices, separately dissenting in *Street,*

17. Indeed, this seems to be recognized in *Joyce, supra,* 454 F.2d at 976, where the court described such conduct as evidencing non-appreciation of the blessings which the flag represents, and intolerance of the finest representative government in the world, feelings which we note are not necessarily contemptuous. We find it difficult to reconcile this description with the court's conclusion that the statute which it was examining did not affect First Amendment rights more than marginally.

18. We note that the parties in this case have treated the statute's constitutionality in terms of its compliance with the *O'Brien* standards and the district court based its decision on the application of those standards. However, *O'Brien* was concerned with a situation where "'speech' and 'nonspeech' elements are combined in the same course of conduct", *O'Brien, supra* 391 U.S. at 376, 88 S.Ct. at 1678. What we have said thus far indicates that Mass.Gen.Laws ch. 264, § 5 affects not only conduct containing speech and non-speech elements, but also "silent, passive expression of opinion" with the flag which should not be viewed as "symbolic speech", but rather should be treated as "closely akin to 'pure speech'" because of the "political or controversial significance" of the symbols. *Tinker.* In that

situation, the Court apparently does not apply the *O'Brien* test, but instead treats the statute as if only pure speech were involved. *Tinker;* Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). *See also* Thornhill; Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Nevertheless, we have applied the *O'Brien* test with the realization that if the statute cannot meet those standards for constitutionality, it is *a fortiori* unconstitutional if viewed as affecting pure speech.

19. *Joyce;* Hoffman v. United States, 144 U.S.App.D.C. 156, 445 F.2d 226 (1971); United States v. Ferguson, 302 F.Supp. 1111 (N.D.Cal.1969); Sutherland v. De-Wulf, 323 F.Supp. 740 (S.D.Ill.1971).

20. *Hodsdon;* Parker v. Morgan, 332 F. Supp. 585 (W.D.N.C.1971).

21. State v. Waterman, 190 N.W.2d 809 (Iowa 1971); People v. Radich, 26 N.Y. 2d 114, 308 N.Y.S.2d 846, 257 N.E.2d 30 (1970), aff'd by equally divided Supreme Court, 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971); People v. Cowgill, 274 Cal.App.2d 923, 78 Cal.Rptr. 853, appeal dismissed, 396 U.S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970); State v. Kasnett, 30 Ohio App.2d 77, 283 N.E. 2d 636 (Ct. of App., Athens County 1972).

noted that there is a valid state interest in punishing acts of desecration and disgrace to the flag.

■ We have previously found that the phrase "treats contemptuously" is so vague so as to include words and feelings, as well as acts, thus clearly transgressing the bounds of constitutionality in the former application as determined by *Street*. Yet when the application is also to an act constituting contemptuous treatment of the flag, there arises an issue explicitly left open by Mr. Justice Harlan's majority opinion in *Street* and his concurrence in *Cowgill*. We think that West Virginia Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), provides a still solid rationale for the conclusion that it is not within the constitutional power of a state to prescribe criminal penalties for failure to show proper respect towards our flag by words or acts. Factually, of course, *Barnette* can be distinguished because it involved punishment for failure to act affirmatively in a gesture of support for the flag as a symbol of national unity. Here we are concerned with the constitutional competence of a state to forbid by criminal penalties gestures of non-adherence, disapproval or contempt on the basis of promoting patriotism. Yet the applicability of the *Barnette* rationale in this situation is illustrated by its adoption in *Street* for the proposition that the constitutionally protected " 'freedom to be intellectually . . . diverse or even contrary,' and the 'right to differ as to things that touch the heart of the existing order,' encompass the freedom to express publicly one's opinions about our

flag, including those opinions which are defiant or contemptuous." *Street, supra* 394 U.S. at 593, 89 S.Ct. at 1366. While it may be that disrespect for the flag can constitute grounds for non-criminal sanctions, we think that promotion of loyalty and patriotism may not constitutionally furnish a justification for imposition of criminal penalties. If verbal abuse of the flag cannot be proscribed in an effort to encourage respect for our national symbol, then we fail to understand how physical abuse which is visually communicative, the archetype situation which the Massachusetts statute reaches, can similarly be forbidden on these nationalistic grounds.

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette, supra* 319 U.S. at 642, 63 S.Ct. at 1366.[22]

We do not stand alone in this conclusion which may be politically unpopular, but is nevertheless required in our view by our Constitution. In finding the New York state flag desecration law unconstitutional as overbroad, Chief Judge Lumbard accepts Mr. Justice Harlan's analysis of the implications of *Barnette* in *Street* and his dismissal of "the state's interest in ensuring proper respect for the integrity of the flag." *Cahn, supra* 437 F.2d at 349–350; *Crosson, supra* 319 F.Supp. at 1087–1088; *Thoms, supra* 334 F.Supp. at 1210–1211.[23] We therefore are satisfied that

---

22. We do not find this analysis to be in conflict with the Court's decision in *Halter*. There, the challenge to the flag desecration statute was mounted by an advertiser who had utilized the flag symbol on beer bottles. It sought to bring the offensive conduct within the general protection afforded to our liberties, and thus did not expressly treat the problem within the framework of First Amendment rights or under overbreadth analysis. In any event, there is serious doubt in our judgment as to the continued vitality of *Halter*

in view of *Barnette*. In adhering to the principles espoused in *Barnette* we are following what we believe to be the sounder, and certainly more recent, Supreme Court consideration of state schemes for promoting patriotism.

23. The Supreme Court has also ruled that "a state has no legitimate interest in protecting any or all religions from views distasteful to them" sufficient to justify prior restraints. Burstyn v. Wilson, 343 U.S. 495, 505, 72 S.Ct. 777, 782, 96 L.Ed. 1098 (1952).

the activity sought to be punished by this statute falls within Mr. Justice Harlan's concern in *Street* that *"opinions* which are defiant or contemptuous" [emphasis added], be they expressed by words or communicative acts, cannot be punished in an attempt to engender respect for our flag.[24]

Obviously, however, a state does have a valid interest in prohibiting conduct which will incite others to commit unlawful acts or provoke retaliatory actions amounting to a breach of the peace. It is quite possible that just as pure speech may cross a threshold beyond which it ceases to be safeguarded by the First Amendment, Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), so may the symbolic speech with which we are concerned, though we reject any suggestion in *Joyce, supra* 454 F.2d at 988–989 n. 42, that all acts of flag desecration are analogous to the use of "fighting words".[25]

Second, having determined that it is within the constitutional power of the state to punish flag desecration which presents some immediate threat of breach of the peace, there can be no doubt that the broad Massachusetts statute furthers that substantial or important government interest. Similarly, we must concede that if the Commonwealth were correct in its assertion that it could constitutionally promote nationalism through criminal penalties, then the statute's *in terrorem* effect strongly furthers that interest. However, the analysis under *O'Brien* does not end here.

Third, the governmental interest alleged by the Commonwealth must be unrelated to the suppression of free ex-

pression. Yet our analysis of the statute and colloquy with counsel at oral argument make it clear that if the Massachusetts flag desecration law is sought to be justified by promotion of patriotism, loyalty and nationalism, it can only do so by being, as it is, directed point blank at the expression of and mere belief in particular ideas. Identical acts committed to the flag—one sufficiently scornful to constitute contempt, and the other done in the absence of that requisite attitude—would be treated differently under the statute. Thus, as counsel admitted, a war protester who, while attending a rally at which it begins to rain, evidences his disrespect for the American flag by contemptuously covering himself with it in order to avoid getting wet, would be prosecuted under the Massachusetts statute. Yet a member of the American Legion who, caught in the same rainstorm while returning from an "America—Love It or Leave It" rally, similarly uses the flag, but does so regrettably and without a contemptuous attitude, would *not* be prosecuted. When the statute is thus bared in skeletal form, its constitutional infirmity can be seen to adhere not to the attempt to punish an act, but rather to an effort to isolate and chastise an attitude said to be contemptuous. It is not an evil mind which is sought to be penalized, but rather what the state considers an impure mind, one which regards our flag with an attitude of disdain or scorn, *Hodsdon, supra* 310 F.Supp. at 534, and cannot be "officially approved". *Tinker, supra* 393 U.S. at 511, 89 S.Ct. 733.

Most importantly, the principles which we have attempted to state, however inadequately, are reflected in Schacht v. United States, 398 U.S. 58, 90 S.Ct.

---

24. Even if we, the Second Circuit, and the other courts just cited are in error in drawing from *Barnette* and *Street* the teaching that there is no important state interest in protecting the physical integrity of the flag, our decision would be unaffected. As our subsequent discussion indicates, we would be compelled to hold either (1) that such an interest would fail under the third *O'Brien* standard in that

the statute is related to the suppression of free expression, or (2) that it would fail under the fourth standard in that the incidental restriction imposed on First Amendment freedoms by this particular statute is greater than is essential to the furtherance of that interest.

25. *Infra*, at 103–104.

1555, 26 L.Ed.2d 44 (1970). There the Supreme Court was confronted with the conviction of a military man who had violated a federal statute allowing the wearing of an Army uniform off-duty only in theatrical productions which did not "tend to discredit" the Army. The proscription was justified by an attempt to classify it as reaching non-expressional conduct allegedly unprotected by the First Amendment. Yet, Mr. Justice Harlan responded to that argument by stating that the defendant's conviction

> "can be sustained only if he can be punished for speaking out against the role of the Army and our country in Vietnam. Clearly punishment for this reason would be an unconstitutional abridgement of freedom of speech. The final clause of [this statute] which leaves Americans free to praise the war in Vietnam but can send persons like [the defendant] to prison for opposing it, cannot survive in a country which has the First Amendment." *Schacht, supra* at 63, 90 S.Ct. at 1559.

Like the statute punishing the wearing of a military uniform if it tends to discredit the military, the Massachusetts flag desecration statute, to the extent that it evidenced a state interest in promoting nationalism, is directly related to the suppression of free expression. Like the school regulation in *Tinker*, it seeks to prohibit "expression of one particular opinion". *Id.* 393 U.S. at 511, 89 S.Ct. 733. Since, however, the statute is alleged to be additionally concerned with breaches of the peace, we find that this second motive is sufficiently unrelated to the suppression of First Amendment rights so as to satisfy the third element of the *O'Brien* test.

 We now address the fourth, and last, step in the *O'Brien* analysis. Since experience has demonstrated the propriety of imposing some restrictions on the exercise of First Amendment rights where substantial government interests are at stake, Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), it is of utmost importance that

these incidental burdens be no greater than is essential to the furtherance of those interests. *O'Brien, supra* 391 U.S. at 377, 88 S.Ct. 1673. Yet our analysis of the Massachusetts statute has revealed that those burdens are heavy and direct, rather than incidental, and are consequently more extreme than necessary to prevent breaches of the peace. The statute focuses upon a particular attitude or belief, the content rather than the form of expression of which provides the foundation for the offense. In that respect, it suffers from a more serious constitutional flaw than the flat ban on certain words which was condemned in Cohen v. California.

Moreover, we believe that the statute is not so narrowly drawn "so as to include within its prohibition only those types of flag desecration which per se are likely to cause breaches of the peace." *Crosson, supra* 319 F.Supp. at 1088. We think that the Massachusetts law is so broad in scope that "[a]t most it reflects an 'undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression.' *Tinker,* [*supra* at] [293 U.S. 503] 508, [89 S.Ct. 733, 21 L.Ed.2d 731];" Cohen v. California, *supra* 403 U.S. at 23, 91 S.Ct. at 1787. As such, it punishes symbolic speech which may constitute no more than "peacefully expressing unpopular views". Cox v. Louisiana, 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The Massachusetts courts apparently made no effort to delineate the bounds of this desecration law so as to more properly confine its application to situations where disorder is imminent. In fact, the Rescript Opinion of the Supreme Judicial Court, Commonwealth v. Goguen, 1972 Mass.Adv.Sh. 303, 279 N.E.2d 666, does no more than concludes that it is not "on its face or as applied to him a restraint upon the right of freedom of speech . . . ." As it now reads, that statute lacks sufficient "safeguards against impairment of that liberty [of expression] when the public order is not threatened." *Hodsdon, supra* 310 F.Supp. at 535; *Thoms,*

*supra* 334 F.Supp. at 1210; *Crosson, supra* 319 F.Supp. at 1088. Instead, the statute would eliminate a protected form of communication by improperly focusing upon its content, rather than on the locus of its occurrence which would more likely give concern for breaches of the peace. Cohen v. California teaches us that a "flat ban" on the content of a message is not within the constitutional power of a state to impose. We realize that fine distinctions may be drawn between what constitutes the content of, as opposed to the method used in, symbolic speech. Yet in the nebulous realm of symbolic speech there is truth in the statement that "the medium is the message" and to suppress the medium is to censor the message, *Crosson, supra* 319 F.Supp. at 1088; *Thoms, supra* 334 F. Supp. at 1210; *Hodsdon, supra* 310 F. Supp. at 533–534, especially where it is being conveyed through a passive form of expression. *Tinker, supra* 393 U.S. at 514, 89 S.Ct. 733.

If some limiting construction of the flag desecration statute were foreseeable, we might decline to find it unconstitutional as overbroad if we felt that First Amendment rights would not suffer in the interim. However, we have no reason to believe that the Massachusetts courts would so limit that law. Constitutional claims were presented by appellee and rejected at every level of the state court proceedings. Since "our federalism" must take account of individual rights and liberties in its balancing of state and federal interests, it clearly requires that we act now without waiting, perhaps a long time, for another state court ruling on the statute's constitutionality. The advance illimitable threat of criminal sanction which the flag desecration law poses to constitutionally-protected rights of others who may forego those rights can similarly be eliminated only by our timely decision.

We have previously mentioned that the state would have us interpret its statute such that the phrase "treats contemptuously" be thought to refer only to acts which affect the physical integrity of the flag. In part, we have accepted the state's contention for purposes of this case. Yet we are bound by *Thirty-Seven Photographs, supra* 402 U.S. at 369–370, 91 S.Ct. 1400, *Gooding, supra* 405 U.S. at 520, 91 S.Ct. 1686, and *Grayned, supra* 408 U.S. at 110, 92 S.Ct. 2294, that we cannot authoritatively construe state legislation, nor should we do so here where the state courts have adopted an "all or nothing" attitude, *Cahn, supra,* 437 F.2d at 348. This is not a case like *Street* where a federal court could, by excising but a few words, draw precise lines with constitutional certainty so as to eliminate the interpretation or provision of the statute under which the defendant was convicted. Such per se rules of First Amendment privilege. Note, The First Amendment Overbreadth Doctrine, *supra* at 882–910, were appropriate there because the Court felt that the defendant in *Street* might have been convicted of casting contempt, "by words", and it could easily excise those words from the statute, thereby reversing that defendant's conviction. The case before us is quite different in that by deleting the phrase "treats contemptuously" from Mass.Gen.Laws ch. 264, § 5, we would completely frustrate and subvert the Commonwealth's intention as evidenced by those terms. Clearly, as the Commonwealth stated at argument, it does not wish to punish all acts of the flag, but only contemptuous ones. Yet to alter the face of this statute, leaving it to read "Whoever publicly mutilates, tramples upon, [or] defaces . . . the flag" would be legislating for the state, because the element of contempt common to every offense under this statute would be removed. Additionally, this is not a case like New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), or Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), where a statute dealt with a specific subject matter such that the Court could immediately seize upon a few constitutional factors which could be·

built in to the statute. While judicial activity in the areas of libel, slander and obscenity is now considered traditional in terms of drawing lines to rescue statutes in those areas, such action here would be more difficult and less desirable for a federal court. Note, The First Amendment Overbreadth Doctrine, *supra* at 897–910.

Therefore, having found that Mass.Gen.Laws ch. 264, § 5 affects an area which includes a large proportion of First Amendment activities; that it possesses the potential for a substantial number of impermissible applications; and that it is not foreseeable that the statute's unconstitutional applications could be immediately and effectively excised without continued interruptions of First Amendment freedoms, we conclude that the statute must fall as overbroad.

Lastly, it remains to be said that if our analysis is valid that the statute unconstitutionally impairs First Amendment rights, its vice of vagueness is all the more serious. A long line of Supreme Court cases in the First Amendment area stand for the proposition that "The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). We therefore note that the Massachusetts statute, having been determined vague, and First Amendment rights being substantially affected by it, falls within this line of cases. *Gooding; Coates;* Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Cox, supra* 379 U.S. at 551–552, 85 S.Ct. 453.

Affirmed.

HAMLEY, Circuit Judge (concurring):

I concur in the majority opinion to the extent that it determines that the court should consider the question of vagueness in a non-First-Amendment context and that, in this context, the portion of the Massachusetts statute applied here is impermissibly vague. These determinations are dispositive of this appeal since they require that the district court order granting the writ be affirmed.

This being so, I express no view concerning the alternative and far broader constitutional ground for affirmance stated in the majority opinion, namely that, in view of First Amendment considerations, the Massachusetts statute is void for overbreadth. There is a settled principle of appellate adjudication that constitutional questions are not to be dealt with unless this is necessary to dispose of the appeal. Moreover, as the majority points out, since the overbreadth technique is a powerful weapon which, if improperly used, may contravene principles of federalism or separation of powers, "it should be applied gingerly by federal courts." I prefer to reserve my own determinations in this delicate constitutional area for a case in which such determinations must be made.