UNITED STATES of America ex rel.
Stephen RADICH, Petitioner-
Relator,

v.

The CRIMINAL COURT OF the CITY
OF NEW YORK et al.,
Respondents.

No. 71 Civ. 2738 (JMC).

United States District Court,
S. D. New York.

Nov. 7, 1974.

Richard G. Green, New York City (Shirley Fingerhood, Adria S. Hillman, Burt Neuborne and Melvin L. Wulf, New York City, of counsel), for petitioner.

Louis J. Lefkowitz, Atty. Gen. of State of N. Y. (Maria L. Marcus, Asst. Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondents.

OPINION

CANNELLA, District Judge.

The writ of habeas corpus is granted.

On May 5, 1967, the petitioner, Stephen Radich, was convicted in the Criminal Court of the City of New York of casting contempt on the American flag in violation of then § 1425(16)(d) of the New York Penal Law, now recodified as § 136(d), of the McKinney's Consol. Laws, c. 20, New York General Business Law.[1] People v. Radich, 53 Misc.2d 717, 279 N.Y.S.2d 680 (Crim.Ct.1967) (2–1 decision). He was sentenced to pay a $500 fine or serve sixty days in the workhouse. On appeal the conviction was affirmed. People v. Radich, 57 Misc.2d 1082, 294 N.Y.S.2d 285 (App.T. 1st Dept.1968) (per curiam), aff'd, 26 N.Y.2d 114, 308 N.Y.S.2d 846, 257 N.E. 2d 30 (1970) (5–2 decision). Petitioner then sought review in the Supreme Court of the United States. The Court, after hearing oral argument on the merits, "affirmed by an equally divided Court" the judgment of the New York Court of Appeals (Mr. Justice Douglas, although present for oral argument, did not participate in the decision). Radich v. New York, 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971).[2]

Immediately upon the affirmance by the Supreme Court, petitioner commenced the instant action in this Court

1. The statute, § 136(d) of the New York General Business Law, provides in pertinent part:

Any person who . . .
　d. Shall publicly mutilate, deface, defile, or defy, trample upon, or *cast contempt upon* [the flag] either by words or act . . . Shall be guilty of a misdemeanor [emphasis added].

This statute, which finds its origin in the Uniform Flag Act, has counterparts in many other states. *See, e. g.,* Rosenblatt, Flag Desecration Statutes: History and Analysis, 1972 Wash.U.L.Q. 193 (1972); Note, Flag Desecration: Illegal Conduct or Protected Expression?, 22 Case W.Res.L.Rev. 555, 556–59 (1971). *Compare,* the Federal Flag Statute, 18 U.S.C. § 700(a),

　Whoever knowingly casts contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning, or trampling upon it shall be fined not more than $1,000 or imprisoned for not more than one year, or both.,

and its legislative history, H.R.Rep.No.350, 90th Cong., 1st Sess. (1967); S.Rep.No. 1287, 90th Cong., 1st Sess. (1968) *with* the present New York formulation. *See also,* Smith v. Goguen, 415 U.S. 566, 582 n. 30, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

2. The full text of the Supreme Court's opinion in Radich v. New York reads as follows:
　PER CURIAM.
　The judgment is affirmed by an equally divided Court.
　MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

seeking relief in the nature of habeas corpus pursuant to 28 U.S.C. § 2241 et seq. On December 3, 1971, in an unreported decision, the Court denied relief upon the ground that the affirmance of Radich's conviction by an equally divided Supreme Court constituted an actual adjudication by that Court of the merits of petitioner's constitutional claims, thus serving to bar subsequent federal habeas corpus relief pursuant to 28 U.S.C. § 2244(c). The Court of Appeals for the Second Circuit reversed and remanded for a determination on the merits, finding that an affirmance by an equally divided Supreme Court did not constitute an actual adjudication of petitioner's constitutional claims within the meaning of the habeas statute. United States ex rel. Radich v. Criminal Court of the City of New York, 459 F.2d 745 (1972). In light of its decision in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972),[3] the Supreme Court denied certiorari, Ross v. Radich, 409 U.S. 1115, 93 S.Ct. 893, 34 L.Ed.2d 698 (1973). The petitioner has been released on one dollar bail pending the adjudication of his claims.[4]

## THE FACTS

In December of 1966, petitioner, the proprietor of an art gallery on Madison Avenue in New York City displayed in his gallery certain "constructions", comparable to sculptures, which had been created by an artist named Marc Morrel. These constructions were partly composed of United States flags or portions thereof, and partly of other objects including a Vietcong flag, a Russian flag, a Nazi swastika and a gas mask. Three of the thirteen three-dimensional art forms which had been displayed in the gallery were singled out for particular attention by the state courts: an object resembling a gun caisson wrapped in a flag, a flag stuffed into the shape of a six-foot human form hanging by the neck from a yellow noose, and a seven-foot "cross with a bishop's mitre on the head-piece, the arms wrapped in ecclesiastical flags and an erect penis wrapped in an American flag protruding from the vertical standard."[5]

At trial, the complaining police officer testified that on December 27, 1966, from a vantage point on Madison Avenue, he had observed the construction which appeared to be a human form hanging from a yellow noose in the window of Radich's second floor gallery. He further testified that upon entering the gallery the following day with a police photographer in order to serve petitioner with a criminal summons he had observed this construction, as well as the others.[6] There was no testimony adduced from any witness of disturbance or disorder in or around the premises of the gallery.

The petitioner and Mr. Hilton Kramer, the art news editor of The New York Times, testified for the defense. Both stated that in their expert opinions the constructions were, under contemporary standards, works of art. In addition, petitioner testified that he had not intended to cast contempt upon or show disrespect for the American flag by vir-

---

3. In Neil v. Biggers, the Court specifically held that its earlier equally divided affirmance on direct appeal did not serve as an actual adjudication on the merits barring subsequent habeas corpus relief.

4. It is now settled beyond dispute that petitioner is "in custody" within the meaning of the federal habeas corpus statute, 28 U.S.C. § 2241 et seq. Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

5. People v. Radich, 53 Misc.2d at 718, 279 N.Y.S.2d at 682.

6. The contents of the criminal summons which served as predicate for Radich's prosecution are as follows:

   [T]he defendant did have on public display and for public viewing, the flag of the United States of America, in the following manner; 1—in the form of a male sexual organ, protruding from the body of form, in the anterior portion of the body of the form and depicting the erected male penis, protruding from a form of a cross. 2—the flag of the United States of America, wrapped in a chained bundle. 3—[T]he standard of the United States on

tue of his exhibition of the constructions; that the constructions were intended solely to express protest against the American involvement in Vietnam and against war in general.[7] Radich further testified that during the exhibition of these sculptures anti-war protest music, audible throughout the entire gallery, was. played from a tape recorder.[8]

Petitioner was convicted by a three-judge panel in the New York City Criminal Court. That court, Judge Basel dissenting, concluded that Radich had "cast contempt" upon the American flag by virtue of his exhibition of the Morrel contructions in violation of subsection 16(d) of former § 1425 of the Penal Law (now § 136(d) of the General Business Law). The court found the constructions not to come within the ambit of protection afforded to speech by the First Amendment, and that the state, by means of the statute and the prosecution of the petitioner, had properly exercised its police power to restrict acts which might pose an "immediate threat to public safety, peace, or order."[9] In addition, the criminal court rejected petitioner's contention that the statute was unconstitutionally vague, concluding instead that the offense charged was "malum prohibitum", no criminal intent to violate the statute was prerequisite for conviction.[10] Judge Basel dissented, finding the "casting contempt" portion of the statute unconstitutionally vague.[11] The Appellate Term of the Supreme Court for the First Department affirmed petitioner's conviction without opinion.[12]

On appeal, the New York Court of Appeals affirmed the conviction by a divided bench (5–2).[13] That court found the statute neither vague nor requiring a *mens rea* as predicate for criminal liability, and rejected petitioner's First Amendment claims as well.[14] The majority, impliedly accepted the constructions as symbolic speech [15] and, thus, finding them to be within the purview of the First Amendment, applied the analysis suggested by United States v. O'Brien,[16] concluding therefrom that the

the form of an alleged elephant. 4—[T]he Union of the flag of the United States of America, depicted in the form of an octupus [sic]. 5—[T]he American flag attached to a gas meter. 6—[T]he American flag wrapped around a bundle attached to a two wheeled vehicle. 7—[T]he American flag in the form of a body, hanging from a yellow noose.
People v. Radich, 26 N.Y.2d at 118 n. 1, 308 N.Y.S.2d at 848 n. 1, 257 N.E.2d at 31 n. 1.

7. Trial Transcript, reprinted in App ndix to Appellant's Brief in Radich v. New York, 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971), at p. 82a.

8. *Id.* at 80a.

9. 53 Misc.2d at 720–721, 279 N.Y.S.2d at 684–685.

10. *Id.* at 721, 279 N.Y.S.2d at 685.

11. *Id.* at 721–725, 279 N.Y.S.2d at 686–689.

12. People v. Radich, 57 Misc.2d 1082, 294 N.Y.S.2d 285 (App.T.1st Dept.1968) (per curiam).

13. 26 N.Y.2d 114, 308 N.Y.S.2d 846, 257 N.E.2d 30 (1970).

14. *Id.* at 124–125, 308 N.Y.S.2d at 854, 257 N.E.2d 30.

15. The New York Court of Appeals stated: The discussion thus far enables us to reach certain conclusions. It becomes clear . . . that a person with the purest of intentions may freely proceed to disseminate the ideas in which he profoundly believes, but he may not break a valid law to do it. . . . The defendant may have a sincere ideological viewpoint, but he must find other ways to express it.
*Id.* at 123, 308 N.Y.S.2d at 852, 257 N.E.2d at 35. And later in its opinion, the court declared:
While it is true that violations of the flag desecration statute will probably not occur apart from the expression of an idea, the prime reason for the statute was not to insure suppression of such ideas, but rather to insure preservation of the public peace.
*Id.* at 124, 308 N.Y.S.2d at 853, 257 N.E.2d at 36.

16. In United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1967), Mr. Chief Justice Warren declared:
We cannot accept the view that an apparently limitless variety of conduct can be labelled "speech" whenever the person engaging ·in the conduct intends thereby to express an idea.

governmental interest served by the statute (the preservation of the public peace) was unrelated to the suppression of free expression and that petitioner, by his display of the constructions had dishonored and cast contempt upon the United States flag.[17] Chief Judge Fuld, joined by Judge Burke, dissented.

> I do not understand how it may reasonably be said that the mere display of Morrel's constructions in an art gallery, distasteful though they may be, poses the type of threat to public order necessary to render such an act criminal. This prosecution, in my view, is nothing more than political censorship. . . . It should not be constitutionally sustained.[18]

The decision of the New York Court of Appeals was affirmed by an equally divided United States Supreme Court.[19]

## DISCUSSION

On the instant petition, Radich challenges his state conviction upon First and Fourteenth Amendment grounds, specifically, that: (a) the involved statute violates the First Amendment in that casting contempt on the American flag may not constitutionally be made a criminal offense; (b) the statute is unconstitutionally overbroad and vague; and (c) the statute violates the equal protection clause of the Fourteenth Amendment in that it arbitrarily bars sculpture which casts contempt on the flag while permitting other forms of expression, such as pictures, photographs and cartoons which cast contempt on the flag.[20] As the Court finds the recent decision of the Supreme Court in Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) to provide a workable framework within which petitioner's First Amendment challenges can be analyzed, it is content in the conclusion that the New York statute is unconstitutional "as applied" to Radich, reserving to later courts the resolution of the broader constitutional questions which have been presented.[21] *See also,* Cline v. Rockingham County Superior Court, 502 F.2d 789 (1 Cir. 1974).

He thereafter suggested a four-pronged test for the analysis of governmental action in symbolic speech cases.

> [W]e think it is clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

17. We thus conclude that the statute before us does not breach the *O'Brien* requirement . . . that the governmental interest served by it must be unrelated to the suppression of free expression; and we affirm the lower court's conclusion that the legitimate public interest which the statute is designed to protect was threatened by the violation of which defendant was convicted. 26 N.Y.2d at 124, 308 N.Y.S.2d at 854, 257 N.E.2d at 36.

18. *Id.* at 129, 308 N.Y.S.2d at 857, 257 N.E.2d at 39.

19. 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971).

20. Petition at ¶ 12. *See also,* Brief for Appellant in Radich v. New York, 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971), at 3–4.

21. As the Court finds such an "as applied" analysis wholly sufficient to do justice in this habeas corpus case, consideration of petitioner's challenge to the statute as overbroad, as well as the other questions which he has directed to the statute itself, is unwarranted. *Cf.*, Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). As the Court recently declared:

> [T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" towards conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected con-

In recent years, numerous courts, both state and federal, have been called upon to determine the relationship between statutes prohibiting acts of flag desecration and the First Amendment's guarantee of freedom of speech. Such consideration has produced diverse results, as both the state and federal judiciary have been unable to either agree upon the standard to be applied, or uniformly determine which conduct is to be protected and which is to be proscribed.[22] The commentators, on the other hand, while similarly unable to agree upon a uniform standard for balancing the guarantees of the First Amendment against the interests of the state in prohibiting acts of flag desecration, have almost uniformly opposed the imposition of criminal sanctions for conduct such as that engaged in by Radich.[23] Although the Supreme Court has had several opportunities in years past to consider and define the limits of the protection afforded by the First Amendment to acts of flag desecration, including the direct appeal of petitioner's conviction,[24] it was not until the term just passed that the Court provided direction for lower courts in resolving these controversies.

In the first flag related decision of the 1973 Term, Smith v. Goguen, 415 U. S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), the Court affirmed a First Circuit decision which had granted habeas corpus relief to a state prisoner who had been convicted of violating a Massachusetts statute making it a crime to "treat contemptuously" the flag of the United States. The district court[25] and the court of appeals[26] had concluded that the contempt provision of the Massachu-

duct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. . . . To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). See also, Goguen v. Smith, 471 F.2d 88, 105 (1 Cir. 1972) (Hamley, J., concurring), aff'd on other grounds, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

22. See, cases collected in Mr. Justice White's concurring opinion in Smith v. Goguen, 415 U.S. 566, 583-584 n. 1, 94 S.Ct. 1242, 39 L. Ed.2d 605 (1974). See also, cases collected in People v. Vaughan, 514 P.2d 1318, 1320 nn. 2 and 3 (Sup.Ct.Colo.1973); State v. Farrell, 209 N.W.2d 103, 105-106 (Sup.Ct. Iowa 1973) and Nimmer, The Meaning of Symbolic Speech under the First Amendment, 21 U.C.L.A.L.Rev. 29, 48, nn. 73-74 (1973) [hereinafter "Nimmer"].

23. See, e. g., T. Emerson, The System of Freedom of Expression 88 (1970); Nimmer, supra; Rosenblatt supra note 1; Mittlebeeler, Flag Profanation and the Law, 60 Ky. L.J. 885 (1972); Comment, Flag Desecra-

tion as Constitutionally Protected Symbolic Speech, 56 Iowa L.Rev. 614 (1971); Comment, Flag Desecration Statutes in Light of United States v. O'Brien and the First Amendment, 32 U.Pitt.L.Rev. 513 (1971); Comment, New York Flag Desecration Statute—Abridgement of First Amendment Rights—Symbolic Protest through Artistic Expression, 16 N.Y.L.F. 493 (1970); Note, 22 Case W.Res.L.Rev. 555, supra note 1; Note, Flag Desecration Under the the First Amendment: Conduct or Speech, 32 Ohio St.L.J. 119 (1971); Note, Freedom of Speech and Symbolic Conduct: The Crime of Flag Desecration, 12 Ariz.L.Rev. 71 (1970); Note, Flag Burning, Flag Waving and the Law, 4 Valparaiso U.L.Rev. 345 (1970); Note, The Bill of Rights and National Symbols: Flag Desecration, 1970 Wash.U.L.Q. 517 (1970); Note, Symbolic Conduct, 68 Colum.L.Rev. 1091 (1968); Note, Constitutional Law—Freedom of Speech—Desecration of National Symbols as Protected Political Expression, 66 Mich.L. Rev. 1040 (1968).

24. See, e. g., Radich v. New York, 401 U.S. 531, 91 S.Ct. 1217, 28 L.Ed.2d 287 (1971) (per curiam); Cowgill v. California, 396 U. S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970) (per curiam); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969).

25. 343 F.Supp. 161 (D.Mass.1972).

26. 471 F.2d 88 (1 Cir. 1972).

setts flag misuse statute was both unconstitutionally vague and impermissibly overbroad. The Supreme Court affirmed on vagueness grounds alone, finding that the statute failed to draw reasonably clear lines between the kinds of nonceremonial treatment of the flag which are criminal and those which are not.[27] Justice Powell, writing for the Court, specifically declined an invitation to address the substantive First Amendment arguments advanced.[28] Mr. Justice White concurred in the result; the Chief Justice and Justices Blackmun and Rehnquist dissented.

In June of this year, subsequent to its decision in *Smith*, the Supreme Court, in Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), reversed the state court conviction of an individual who had been found guilty of violating a Washington statute proscribing improper uses of the flag. Spence, a college student, had hung a United States flag from his apartment house window. The flag was in an upside down position and had attached upon both of its sides a peace symbol fashioned of removable black tape. At trial, Spence testified that he had put the symbol on the flag in protest against the then recent invasion of Cambodia by United States forces and the killings at Kent State University. It was conceded by the state that the sole reason for the arrest was his placing of the peace symbol on the flag and exposing it to public view in that condition. The Supreme Court, in a *per curiam* opinion (three Justices dissenting), reversed the conviction. The Court found that Spence's use of the flag constituted the expression of an

27. Petitioner urges that this Court find the New York statute "void for vagueness", as well as impermissibly overbroad. While such a contention gains vitality in light of the Supreme Court's decision in *Smith*, *but see*, 415 U.S. at 582–583 n. 31, 94 S.Ct. 1242, the Court does not reach the issue here.

In rejecting petitioner's "void for vagueness" argument, the New York Court of Appeals stated:

The statute is not unconstitutionally vague; and at least few of the "constructions" clearly cast the flag into dishonor.

26 N.Y.2d at 125, 308 N.Y.S.2d at 854, 257 N.E.2d at 36. The State, in response to petitioner's present argument, asserts that whatever facial vagueness might heretofore have plagued the statute has been divested by the judicial gloss found both in *Radich* and the subsequent case of People v. Keough, 31 N.Y.2d 281, 338 N.Y.S.2d 618, 290 N.E.2d 819 (1972). While it may be said that these decisions speak to the relationship between the enforceability of the statute and the constitutionally necessary requirement of a "likelihood of incitement to disorder", the Court does not perceive them to address the vagueness which might be found inherent in the statutory phrase "cast contempt". It is to this term that petitioner addresses his vagueness challenge and it is this question that the Court does not here reach, in light of the conclusion that the statute is unconstitutional as applied to Radich.

It should be noted, however, that the "treats contemptuously" phrase contained in the Massachusetts statute which was held impermissibly vague by the Court in *Smith* has been distinguished from the "cast contempt" language employed in the New York formulation. *See, e. g.*, State v. Royal, 305 A.2d 676, 679 (Sup.Ct.N.H.1973) (discussed in Mr. Justice White's concurring opinion in Smith v. Goguen, 415 U.S. at 588–589 n. 3, 94 S.Ct. 1242; *but see*, Commonwealth v. Young, 325 A.2d 315 (Pa.Super.1974) (declaring unconstitutional a Pennsylvania statute worded identically to that of New York).

Additionally, it may be said that the New York statute retains vitality as presently formulated and as construed by the cases in certain limited instances. For example, in the case of Van Slyke v. State, 489 S.W.2d 590 (Tex.Cr.App.1973), appeal dismissed, 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), the defendant was convicted under the Texas flag desecration statute for purporting to masturbate into the American flag while seated on a raised platform in the commons room at Rice University, at a time when numerous persons, were present, one of whom attempted to physically take the flag from Van Slyke. Cases embracing facts of this sort well comport with the analysis set forth in the ensuing paragraphs of this decision and present the type of conduct against which the state may justifiably act; breach of the peace may well be perceived as imminent in such circumstances.

28. 415 U.S. at 582–583 n. 32, 94 S.Ct. 1242. Justices White, Blackmun and Rehnquist discussed the First Amendment issues in their separate opinions, 415 U.S. at 583, 590 and 591, 94 S.Ct. 1242.

idea through activity, and that his conduct was sufficiently imbued with communicative elements as to bring it within the ambit of speech protected by the First Amendment. The Court then held that no state interest which arguably supported the prosecution had been sufficiently impaired by Spence's activity as to warrant the imposition of criminal sanctions. Hence, the Court in *Spence* may be said to have adopted a two-step analysis. First, a determination of whether flag related conduct is within the protections of the First Amendment, and, second, whether, upon the record of the given case, the interests advanced by the state are so substantial as to justify infringement of constitutional rights. Mr. Justice Blackmun concurred in the result and Mr. Justice Douglas separately concurred for reasons advanced by the Supreme Court of Iowa in State v. Kool, 212 N.W.2d 518 (1973).

In addition to the decisions in *Smith* and *Spence,* the Supreme Court, during the 1973 Term, summarily disposed of five other appeals involving the flag and its relationship with the First Amendment.[29] Several of these summary decisions involved convictions pursuant to statutes similar to that at bar and the action of the Supreme Court with respect to these cases, when read togeth-er with the decision in *Spence,* well illuminates the path upon which this Court will now travel.

## SYMBOLIC SPEECH

In Spence, the Court recognized that certain "activity [is] sufficiently imbued with elements of communication [as] to fall within the scope of the First and Fourteenth Amendments. . . ."[30] At the same time, the Court reiterated that " '[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.' "[31] Thus, as point of departure for this Court's analysis of the constitutionality of petitioner's state court conviction, it must be determined whether or not his exhibition of the Morrel constructions is entitled to protection under the First Amendment. Such determination is to be made by objectively viewing "the nature of [petitioner's] activity, combined with the factual context and environment in which it was undertaken;"[32] a standard requiring "intent to convey a particularized message" and, from the surrounding circumstances a "likelihood . . . that the message would be understood by those who viewed it."[33]

29. Heffernan v. Thomas, 418 U.S. 908, 94 S. Ct. 3199, 41 L.Ed.2d 1154 (1974), vacating and remanding, 473 F.2d 478 (2 Cir. 1973); Van Slyke v. Texas, 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), dismissing appeal from, 489 S.W.2d 590 (Tex.Cr.App. 1973); Sutherland v. Illinois, 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), vacating and remanding, 9 Ill.App.3d 824, 292 N. E.2d 746 (1973); Farrell v. Iowa, 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), vacating and remanding, 209 N.W.2d 103 (Sup.Ct.Iowa 1973); Cahn v. Long Island Vietnam Moratorium Committee, 418 U.S. 906, 94 S.Ct. 3197, 41 L.Ed.2d 1153 (1974), aff'g., 437 F.2d 344 (2 Cir. 1970).
30. 418 U.S. at 409, 94 S.Ct. at 2730.
31. *Id.*
32. *Id.*
33. *Id.*
    [T]he following criteria seem helpful in defining the symbolic conduct. First, the conduct should be assertive in nature. This will generally mean that the conduct is a departure from the actor's normal activities and cannot adequately be explained unless a desire to communicate is presumed. Second, the actor must have reason to expect that his audience will recognize his conduct as communication. Third, communicative value does not depend on whether the idea sought to be expressed can be verbalized. The symbolism or medium may be an idea in itself.
    Note, 68 Colum.L.Rev., *supra* note 23, at 1117. *Se also,* Smith v. United States, 502 F.2d 512 (5 Cir. 1974); Nimmer at 37 ("[S]ymbolic speech requires not merely that given conduct results in a meaning effect, but that the actor causing such conduct must intend such a meaning effect by his conduct."); Comment, 56 Iowa L.Rev., *supra* note 23, at 620–621. *Compare,* United States v. Donner, 497 F.2d 184 (7 Cir. 1974), petition for cert. filed, 43 U.S.L. W. 3095 (July 9, 1974) (No. 74–98).

That petitioner's display of the Morrel constructions was symbolic speech, that is non-verbal communicative conduct or expression intended to espouse an idea or express a certain viewpoint, is, when viewed both with regard to the symbol employed and the context in which that symbol was so employed, plainly apparent to this Court.[34]

■ The American flag has long been recognized as a symbol possessed of a "very special meaning."[35] As was stated in *Spence*:

The Court for decades has recognized the communicative connotations of the use of flags. . . . In many of their uses flags are a form of symbolism comprising a "primitive but effective way of communicating ideas . . . ," and "a shortcut from mind to mind." [Citations omitted][36]

Other federal courts which have considered the symbolic nature of the American flag have been eloquent in defining its expressive qualities,[37] and this Court need not engage in lengthy discourse upon the symbolic character of the flag as it finds the communicative qualities of our national standard to be as well recognized as they are obvious. Indeed, as Chief Judge Coffin has noted, were the flag not possessed of such communicative nature,

---

34. The display of the Morrel constructions was so "closely akin to 'pure speech'" because of the artistic, political and controversial significance of the sculptures, that had this case not been presented to the State Courts as a "symbolic speech" case and this Court now free to write upon a *tabula rasa*, the Court might well be persuaded to analyze Radich's activity in terms of 'pure speech' alone. Such analysis notwithstanding, the Court here applies a symbolic speech analysis "with the realization that if the statute cannot meet those standards for constitutionality, it is *a fortiori* unconstitutional if viewed as affecting pure speech." Goguen v. Smith, 471 F.2d at 100 n. 18 (citing Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). As one commentator has stated: Displaying art, no matter how repulsive, is nothing if it is not communication. The artist who uses the flag does so precisely because of what its symbolism will call up in the minds of those who study his *work*

Note, 32 Ohio St.L.J., *supra* note 23, at 146. *See also*, Rosenblatt, *supra* note 1, at 219–223 (discussing flag related conduct as art).

35. Goguen v. Smith, 471 F.2d at 99. *See also*, West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 632–633, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Mittlebeeler, *supra* note 23, at 924.

36. 418 U.S. at 410, 94 S.Ct. at 2730 (quoting from *Barnette* 319 U.S. at 632, 63 S.Ct. 1178, 87 L.Ed. 1628).

As Mr. Justice White declared in his concurring opinion in *Smith*, 415 U.S. at 587, 94 S.Ct. at 1254:

One need not explain fully a phenomenon to recognize its existence and in this case to concede that the flag is an important symbol of nationhood and unity, created by the nation and endowed with certain attributes.

*See also*, Mr. Justice Rehnquist's dissenting opinion in *Smith*, 415 U.S. at 601–603, 94 S. Ct. 1242.

37. [W]e think it is self-evident that most, if not all, conduct associated with the United States flag is symbolic speech. Such conduct is normally engaged in with the intent to express some idea. Further, such conduct is invariably successful in communicating the idea. There is nothing equivocal about a flag-draped casket or a flag flying at half-mast at the death of a dignitary. Nor in this day and time is anyone likely to mistake the nature of the ideas expressed by a young person who desecrates his country's flag at an anti-war gathering.

Crosson v. Silver, 319 F.Supp. 1084, 1086 (D.Ariz.1970) (three-judge court).

As the three-judge court in Parker v. Morgan, 322 F.Supp. 585, 588 (W.D.N.C.1971) stated:

If the flag says anything at all, and we agree it often may in a given context, we think it says everything and is big enough to symbolize the variant viewpoints of a Dr. Spock and a General Westmoreland. With fine impartiality the flag may head up a peace parade and at the same time and place fly over a platoon of soldiers assigned to guard it.

. . . Sometimes the flag represents government. Sometimes it may represent opposition to government. Always it represents America—in all its marvelous diversity.

*See also*, Joyce v. United States, 147 U.S. App.D.C. 128, 454 F.2d 971, 973–976 (D.C. Cir. 1971), cert. denied, 405 U.S. 969, 92 S. Ct. 1188, 31 L.Ed.2d 242 (1972).

[i]f it did not speak by itself as a symbol of the United States of America, we doubt that any state would have sought to protect its message from verbal or physical abuse . . . [38]

by means of statutes such as that now at bar.

■ In addition to the symbolic nature of which the American flag is possessed standing alone, "the context in which [this] symbol is used for purposes of expression is important, for the context may give meaning to the symbol." [39] In the instant case, the context and environment in which Radich displayed the Morrel constructions is revealing. He did so at the time of this nation's most significant involvement in the Vietnam conflict, as a means of signifying his dissent and protest against the American action. The playing of recorded anti-war protest music in the gallery during the exhibition further intensified the symbolic and communicative nature of the display. In such an environment, in the context and tenor of those times, "it would have been difficult for the great majority of citizens to miss the drift of [petitioner's] point at the time that he made it" by the display of the sculptures.[40] It must be concluded that Radich's exhibition "was not an act of mindless nihilism. Rather, it was

a pointed expression of anguish . . . about the then current . . . foreign affairs of his government. An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." [41] Petitioner's display of the Morrel constructions was, therefore, symbolic speech "of a nature closely akin to 'pure speech' ", hence embued with the protections of the First Amendment.

## THE INTERESTS OF THE STATE OF NEW YORK

■■ Having thus concluded that petitioner's exhibition of the sculptures constituted speech and communicative expression coming within the purview of the First Amendment, the Court next turns to consider those state interests which might be advanced to support his conviction and the resulting suppression of expression. In *Spence,* the Court, drawing upon its earlier opinion in *Street v. New York,*[42] addressed itself to three principal interests which conceivably could be called upon to justify state action against flag desecration: (1) prevention of breach of the peace; (2) protection of the sensibilities of passersby; and (3) preservation of the American flag as an unalloyed symbol of our coun-

---

38. Goguen v. Smith, 471 F.2d at 99. *See also,* Cline v. Rockingham County Superior Court, 367 F.Supp. 1146, 1149 (D.N.H. 1973), aff'd on other grounds, 502 F.2d 789 (1 Cir. 1974).

39. 418 U.S. at 410, 94 S.Ct. at 2730.

40. *Id.*

41. *Id.*
[D]enial of First Amendment protection for communicative conduct unnecessarily alienates those who do not possess verbal skills. Implicit in the notion that the First Amendment gives a man the right to say what he wants is the idea that a man must be able to form his own beliefs and opinions, that he is to be allowed to express his thoughts and beliefs in his own way, and that any suppression of either the formation or the expression of these beliefs and opinions is an affront to his

dignity. Perhaps the artist in People v. Radich who wrapped a construction resembling a dead body in an American flag had not the eloquence to express in words his disgust and revulsion with America and its participation in what he believed to be an unjustified war.
Note, 68 Colum.L.Rev., *supra* note 23, at 1107. *See also,* Emerson, *supra* note 23, at 88.
[U]ltimately it is difficult to avoid the conclusion that desecration of the flag, however obnoxious it may be to some of us, is realistically intended as expression and nothing else. It should therefore be treated as such. For those who may be shocked by this conclusion it is well to remember that loyalty to the flag, like loyalty to the country, cannot be coerced.

42. 394 U.S. 576, 590–594, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969).

try.[43] In addition to these three primary interests, the Supreme Court noted certain additional factors which are as pertinent to the instant case as they were to the case then before the Court.

> First, this was a privately-owned flag. In a technical property sense it was not the property of any government. . . . Second, appellant displayed his flag on private property. He engaged in no trespass or disorderly conduct. Nor is this a case that might be analyzed in terms of reasonable time, place or manner restraints on access to a public area.[44]

Similarly, there is no evidence in the state court record which would demonstrate that the flags employed in the Morrel constructions were other than privately-owned flags and, it is clear, that the constructions were displayed in Radich's own art gallery; upon private property.

## PRESERVATION OF THE FLAG AS AN UNALLOYED SYMBOL

■ In *Spence,* the Court discussed the state's interest in preserving the flag "as an unalloyed symbol of our country" in the following terms:

> Presumably, this interest might be seen as an effort to prevent the appropriation of a revered national symbol by an individual, interest group, or enterprise where there was a risk that association of the symbol with a particular product or viewpoint might be taken erroneously as evidence of governmental endorsement. Alternatively, it might be argued that the interest asserted by the state court is based on the uniquely universal character of the national flag as a symbol.

For the great majority of us, the flag is a symbol of patriotism, of pride in the history of our country, and of the service, sacrifice and valor of the millions of Americans who in peace and war have joined together to build and to defend a Nation in which self-government and personal liberty endure It evidences both the unity and diversity which are America. For others the flag carries in varying degrees a different message. "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." [Citation omitted] It might be said that we all draw something from our national symbol, for it is capable of conveying simultaneously a spectrum of meanings. If it may be destroyed or permanently disfigured, it could be argued that it will lose its capability of mirroring the sentiments of all who view it.

But we need not decide in this case whether the interest advanced by the court below is valid. We assume *arguendo* that it is. The statute is nonetheless unconstitutional as applied to appellant's activity. There was no risk that appellant's acts would mislead viewers into assuming that the government endorsed his viewpoint. To the 'contrary, he was plainly and peacefully protesting the fact that it did not. Appellant was not charged under the desecration statute . . . nor did he permanently disfigure the flag or destroy it. He displayed it as a flag of his country in a way closely analogous to the manner in which flags have always been used to convey ideas.[45]

---

43. 418 U.S. at 412, 94 S.Ct. at 2731.

44. *Id.* at 408, 94 S.Ct. at 2729. *Compare* the dissenting opinions of Mr. Justice Rehnquist in Smith v. Goguen, 415 U.S. at 591, 94 S. Ct. 1242 and Spence v. Washington, 418 U.S. at 416, 94 S.Ct. at 2733 and Mr. Justice Fortas in Street v. New York, 394 U.S. at 616, 89 S.Ct. 1354 *with* Nimmer at 52–53; Comment, 32 U.Pitt.L.Rev., *supra* note 23, at 523–524,

Many flags, however, are not government property, and the continued existence or non-existence of a privately-owned flag according to the tastes of its owner can have no imaginable relation to the inner working of government. The government interest, then, must lie elsewhere.

45. 418 U.S. at 412–415, 94 S.Ct. at 2731–2732 [footnotes omitted]. Other Justices (and

In so assuming *arguendo* the Court stated.

'If this interest is valid, we note that it is directly related to expression in the context of activity like that undertaken by appellant. For that reason and because no other governmental interest unrelated to expression has been advanced or can be supported on this record, the four-step analysis of United States v. O'Brien, 391 U.S. 367, 377 [88 S.Ct. 1673, 1679, 20 L. Ed.2d 672] . . . is inapplicable.[46]

Notwithstanding the fact that petitioner has been convicted under the New York desecration statute of casting con-

this Court were it not constrained by the weight of precedent) have taken the view that preservation of the physical integrity of the flag is a sufficient basis upon which states may act to curtail the exercise of First Amendment rights in the flag desecration context.

I would not question those statutes which proscribe mutilation, defacement or burning of the flag or which otherwise protect its physical integrity, without regard to whether such conduct might provoke violence. Neither would I find it beyond congressional power, or that of state legislatures, to forbid attaching to or putting on the flag any words, symbols or advertisements. All of these objects, whatever their nature, are foreign to the flag, change its physical character, and interfere with its design and function. There would seem to be little question about the power of Congress to forbid the mutilation of the Lincoln Memorial or to prevent overlaying it with words or other objects. The flag is itself a monument, subject to similar protection.

*Smith,* 415 U.S. at 587, 94 S.Ct. at 1254 (White, J., concurring). *See also,* Mr. Justice Rehnquist's dissenting opinion in *Smith,* 415 U.S. at 591, 94 S.Ct. 1242, as well as his later dissent in *Spence,* 94 S.Ct. at 2733.

It is interesting to compare the analysis of the several Justices with the thoughts of Professor Nimmer, as expressed in the following passage.

For Americans, probably to a much greater degree than for other peoples, the flag constitutes a sacred embodiment of patriotic sentiments. Is the preservation of the sanctity of this symbol a state interest which will support flag desecration statutes? Clearly this is an anti- not a non-speech interest. A symbol *qua* symbol is essentially a component of speech. The fact that one entity *symbolizes* another (in this case a flag symbolizes the nation) means simply that the former carries a message of identification with the latter. To preserve respect for a symbol *qua* symbol is to preserve respect for the meaning expressed by the symbol. It is, then, fundamentally an interest in preserving respect for a particular idea. An act of flag desecration is a counter symbol, which may express hostility, or at least constitute a contradiction of the sanctity of the idea expressed by the flag symbol. A flag desecration statute is, then, in essence a governmental command that one idea (embodied in the flag symbol) is not to be countered by another idea (embodied in the act of flag desecration). That, of course, is precisely what the First Amendment will not permit. The Court in *Street* expressly held that "respect for our national symbol" is not an interest which may be protected against words that deprecate such respect. If the only governmental interest at stake is the prohibition of communications that deprecate respect for the flag, then it can make no difference that the message of deprecation is expressed by symbolic acts rather than words. In either event the governmental interest to be protected is not, in the *O'Brien* phrase, an "interest unrelated to the suppression of free expression," and hence must succumb to the First Amendment.

Nimmer at 56–57. *See also,* Comment, 32 U.Pitt.L.Rev., *supra* note 23, at 528; Note, 12 Ariz.L.Rev., *supra* note 23, at 85.

**46.** 418 U.S. at 414, 94 S.Ct. at 2732 n. 8. *Compare* the statement of the text *with* the views expressed by Mr. Justice Rehnquist in his dissenting opinion in *Smith,* 415 U.S. at 598–600, 94 S.Ct. 1242.

Other courts have also considered the state's interest in preserving the physical integrity of the flag, as well as the flag as a national symbol. Some have found such interest to be sufficient ground upon which a criminal conviction for flag desecration might be predicated; others have dismissed this factor as insufficient to warrant abridgment of constitutional rights; while still others, applying an *O'Brien* test, have arrived at diverse results, finding either that such interest was so inexplicably intertwined with the ideas expressed by means of the flag related conduct as not to form a sufficient independent basis for denying constitutionally guaranteed rights or not so inexplicably intertwined as to prevent its invocation. *See,* cases cited and accompanying text, Goguen v. Smith, 471 F.2d at 100 nn. 19–21. *See also,* United States v. Crosson, 462 F.2d 96

tempt upon the flag, it can not be said that his display of the Morrel constructions exhibited the flag in a fashion from which "it could be argued that it will lose its capability of mirroring the sentiments of all who view it." The constructions and their display would have been valueless as communication and meaningless as protest were the flag not invoked by the artist in the fashion and form in which it was. Unlike the flag which is burned, destroyed or otherwise substantially and permanently disfigured, thereby divesting it of its "capability of mirroring the sentiments of all who view it," Morrel's use of the flag simply transferred the symbol from traditional surroundings to the realm of protest and dissent.[47] This shifting of context did not rape the flag of its universal symbolism. Those who are accustomed to emotions of pride when viewing the flag atop this courthouse, might well have been moved to revulsion when confronted with Morrel's works in the gallery. Others, perhaps, were deeply moved and made proud of our "constitutionally guaranteed 'freedom to be intellectually . . . diverse or even contrary' "[48] when viewing the constructions; persons in whom the flag would otherwise stir no emotion. "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn."[49]

The quality of the flag as a symbol embraced within Morrel's sculptures was the expression intended by their exhibition. Unlike the consumption of the flag when it is burned as the *vehicle* for expression of an idea, the flag as displayed by petitioner in his gallery was itself the idea, the *sine qua non* for the artist's endeavors. The symbol was not consumed by the sculptures, but rather, flourished in all of its communicative majesty, unalloyed and undiminished. "It is the character, not the cloth, of the flag which"[50] the State of New York has interest in preserving and, here, the sumbolic character of the flag was neither trammeled upon nor dimmed.

## PROTECTION OF THE SENSIBILITIES OF PASSERSBY

The second factor which was stated, analyzed and rejected by the Court in *Spence*, "that the State may have desired to protect the sensibilities of passersby," is similarly unavailing to the State of New York in the instant case.

"It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." [citation omitted] Moreover, appellant did not impose his ideas upon a captive audience. Anyone who might have been offended could easily have avoided the display.[51]

---

(9 Cir. .972) ; Cline v. Rockingham County Superior Court, 367 F.Supp. at 1150–1151; Jones v. Wade, 338 F.Supp. 441 (N.D.Tex. 1972), rev'd on other grounds, 479 F.2d 1176 (5 Cir. 1973) ; Crosson v. Silver, 319 F.Supp. at 1087; People v. Vaughan, 514 P.2d at 1323; State v. Farrell, 209 N.W.2d at 106; State v. Royal, 305 A.2d at 680. The latter view is apparently that which was adopted by the Court in *Spence* and it is specifically adopted by this Court in the instant case.

47. The distinction made between flag burning and like acts and the display for which petitioner stands convicted is made for purposes of illustrating the closeness of the present case to *Spence*, rather than similarity to the usual case which arises under desecration

statutes like § 136(d) of the General Business Law. These views are not intended to express an opinion by this Court concerning the suggestion of several Justices, *see*, n. 45, *supra*, that the state's interest in preserving the physical integrity of the flag is alone sufficient ground to proscribe mutilation, defacement or burning of the flag.

48. Street v. New York, 394 U.S. at 593, 89 S.Ct. at 1366.

49. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. at 632–633, 63 S.Ct. at 1182–1183.

50. 418 U.S. at 421, 94 S.Ct. at 2736 (Rehnquist, J., dissenting).

51. 418 U.S. at 412, 94 S.Ct. at 2731. *See also*, Papish v. Univ. of Mo., 410 U.S. 667,

Similarly, in the matter at bar, petitioner did not thrust his ideas upon a captive audience, but rather displayed the constructions in the privacy of his second floor art gallery. Nor can it be said that the construction which was displayed in the gallery window and visible to persons located on the street below was so unavoidable as to require its suppression.

## PRESERVATION OF THE PUBLIC PEACE

In affirming the lower courts' conviction of the petitioner, Judge Gibson, speaking for the New York Court of Appeals, stated, "the prime reason for the statute [based upon the legislative history] was not to insure suppression of . . . ideas, but rather to insure preservation of the public peace."[52] The Judge concluded that "a reasonable man would consider the wrapping of a phallic symbol with the flag an act of dishonor; he would consider the hanging effigy a dishonor; and to a lesser and more debatable extent it might be found that wrapping the flag in chains, attaching it to a gas meter, and fashioning the other representations involved, were acts dishonoring the flag,"[53] acts which would arouse passions in the average man likely to lead to disorder, thereby warranting abridgement of petitioner's First Amendment rights. This Court finds that such a standard[54] which views the act of display as solely sufficient to allow for the imposition of criminal sanctions, apparently upon the premise that the act creates a possible or hypothetical danger to the public peace, is insufficient predicate upon which the exercise of constitutional rights may be chilled.

This Court has read and reviewed the transcript of petitioner's trial in the New York City Criminal Court and is unable to find in it any objective evi-

---

670, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (*per curiam*) ; Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) ; Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ; Street v. New York, 394 U.S. at 592, 89 S.Ct. 1354; Long Island Vietnam Moratorium Committee v. Cahn, 437 F.2d at 349 ; Nimmer at 55–56 ; Comment, 56 Iowa L.Rev., *supra* note 23, at 626–627 ("this interest in protecting sensibilities is therefore neither frequently nor seriously considered with respect to First Amendment communication.") *Compare*, State v. Waterman, 190 N.W.2d 809, 812 (Sup.Ct.Iowa 1971).

> The record discloses, nonetheless, that the government's interest in protecting the sensibilities of witnesses to the act who might be shocked by it is very real. As Mrs. Martineau put it, "I was more or less crushed." Alvina Fitzgerald, also a desk clerk at the hotel, testified: "It just made me sick." It is only a short step from this feeling of revulsion to an act of retribution.

52.' 26 N.Y.2d at 124, 308 N.Y.S.2d at 853, 257 N.E.2d at 36. Elsewhere in his opinion, Judge Gibson compared petitioner's conduct with that involved in the earlier case of People v. Street, 20 N.Y.2d 231, 282 N.Y.S. 2d 491, 229 N.E.2d 187, rev'd., 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) :

> The Chief Judge's opinion [in Street] then noted that concededly defendant's acts arose out of indignation and a sense of outrage ; that the act was one of incitement and as such threatened the public peace, a result which the State is legitimately interested in preventing. With regard to Street's purpose—to express indignation and protest—the parallel to the case before us is clear. Here, the expression, if less dramatic, was given far wider public circulation and, in consequence, perhaps, a measureable enhancement of the likelihood of incitement to disorder, by the placement of one of the constructions in a street display window of defendant's gallery on Madison Avenue in the City of New York, and the exhibition and exposure for sale of the companion pieces in the public gallery and mercantile establishment within. Implicit in the invitation to view was the opportunity thereby afforded to join in the protest, or in counterprotest, with the consequent potential of public disorder ; or so the trier of the facts could properly find.

*Id.* at 119, 308 N.Y.S.2d at 849, 257 N.E.2d at 32. *Compare*, the court's statement *with* Note, 66 Mich.L.Rev., *supra* note 23, at 1050–51.

53. *Id.* at 123, 308 N.Y.S.2d at 852–853. Compare the text *with* Note 1970 Wash.U. L.Q., *supra* note 23, at 525–26.

54. At what point, if ever, does a "reasonable man" break the law and breach the peace?

dence whatever which would sustain the conclusion that a breach of the peace was either likely to occur, or an imminent result of petitioner's exhibition of the Morrel constructions. There is no evidence that any crowd had gathered outside of the gallery nor is there proof that any disturbance or altercation had occurred within the premises. The display of the Morrel pieces had been in progress for approximately two weeks prior to the time that the state acted, and, aside from an expression of outrage by one group which resulted in a civil law suit, [55] there is absolutely no proof of any reaction whatsoever by any individual who viewed the sculptures. Thus, as in *Spence*, the notion that the state acted in preservation of the public peace "is totally without support in the record."

There is no question but that preservation of the public peace is a valid interest which the state may invoke in order to justify prosecutions for flag desecration. *Spence* and the earlier Supreme Court case of Street v. New York so state.[56] Those other cases which have considered the validity of this interest have so concluded.[57] The commentators do not disagree.[58] Rather, the question at bar is to what extent must the state demonstrate the factual existence of this interest, *i. e.*, how imminent must a breach of the peace be, before it can validly act to punish an individual for exercising his First Amendment rights.

Numerous courts have concluded, as did the New York Court of Appeals in *Radich,* that acts of flag desecration are, of themselves, always so inherently inflammatory as to pose so great a danger to the public peace as warrants the state to act.[59] Other courts have adopted the view that an act of flag desecration standing alone is insufficient provocation to justify the imposition of criminal sanctions or abridge First Amendment rights; other objective evidence which demonstrates the imminence of public unrest or a clear and present danger that a breach of the peace is likely must be adduced before a state may constitutionally act in a given case.[60] A fair reading of *Spence,* [61] and those other cases which have delimited the bounds

55. United States Flag Foundation, Inc. v. Radich, 53 Misc.2d 597, 279 N.Y.S.2d 233 (Sup.Ct.1967).

56. 418 U.S. at 412, 94 S.Ct. at 2731. Street v. New York, 394 U.S. at 590–592, 89 S.Ct. 1354. Cf., *Smith,* 415 U.S. at 583, 94 S.Ct. 1242 (White, J., concurring).

57. *See,* cases collected at nn. 59 & 60, *infra.*

58. *See,* note 23, *supra.*

59. *See, e. g.,* Sutherland v. DeWulf, 323 F. Supp. 740 (S.D.Ill.1971); People v. Sutherland, 292 N.E.2d at 749; State v. Farrell, 209 N.W.2d at 107; State v. Royal, 305 A. 2d at 680; State v. Mitchell, 32 Ohio App.2d 16, 288 N.E.2d 216 (Ct.App.1972); State v. Waterman, 190 N.W.2d at 812; People v. Cowgill, 274 Cal.App.2d Supp. 923, 78 Cal. Rptr. 853, 855 (App.Dep't.Super.Ct.1969).

60. *See, e. g.,* Goguen v. Smith, 471 F.2d at 103–104, aff'g., 343 F.Supp. at 165; Cline v. Rockingham County Superior Court, 367 F. Supp. at 1151–1153; Crosson v. Silver, 319 F.Supp. at 1088; Thomas v. Smith, 334 F. Supp. 1203, 1211 (D.Conn.1971) (three-judge court), aff'd, 473 F.2d 478 (2 Cir. 1973), vacated and remanded, 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974);

Hodsdon v. Buckson, 310 F.Supp. 528, 536 (D.Del.1970), rev'd. on other grounds, 444 F.2d 533 (3 Cir. 1971); People v. Vaughan, 514 P.2d at 1323; State v. Kool, 212 N.W.2d at 521; State v. Kasnett, 34 Ohio St.2d 193, 297 N.E.2d 537 (1973); People Von Rosen, 13 Ill.2d 68, 147 N.E.2d 327 (1958).

As the Court stated in State v. Kool, *supra* (adopted by Mr. Justice Douglas in *Spence,* 418 U.S. at 416, 94 S.Ct. at 2733):

This is not to say we are completely sure that no one would be violent. Someone in Newton might be so intemperate as to disrupt the peace because of this display. But if absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only "free" speech would consist of platitudes. That kind of speech does not need constitutional protection.

. . . [W]e will uphold incursion upon symbolic expression on the basis of probable violence only when we are convinced that violence really is probable.

61. Two of the cases which were summarily disposed of by the Supreme Court last term deserve special attention. The first, State v. Farrell, 209 N.W.2d 103 (Sup.Ct.Iowa

of First Amendment freedoms, results in the conclusion that the latter view is the only one which is constitutionally sanctioned; [62] the state's interest in pre-

1973), involved the burning of an American flag in a dormitory courtyard at the University of Iowa in February of 1971, at a time when a crowd had gathered around the desecrators. Defendant was convicted under a statute almost identical to that at bar and her conviction was affirmed by the Iowa Supreme Court. That court viewed the several state interests asserted in support of the conviction through the eyes of an *O'Brien* test. It concluded "all of the above noted state interests heretofore accorded recognition, save and except preventing breaches of the peace, have been criticized or condemned both by courts and legal commentators alike." *Id.* at 106. As to the state's interest in preservation of the public peace the court stated, "The presence or absence of an actual peace disturbance is immaterial, since the physical act of burning a United States flag is conduct which could reasonably be expected to provoke a breach of peace." *Id.* at 107. The Supreme Court, 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), vacated and remanded the cause for further consideration in light of its decision in *Spence*.

The second case, People v. Sutherland, 9 Ill. App.3d 824, 292 N.E.2d 746 (1973), involved the prosecution of several individuals under a statute identical to that of New York for burning a flag upon the lawn adjacent to the Federal Building in Rock Island, Illinois. After the fire had been started, a passing motorist stopped his car, double parked, and proceeded to stomp on the flag to put out the fire. The appellate court relied upon the state's interest in prevention of breaches of the peace and preservation of public order to sustain the conviction. It stated "The defendants also argue that the likelihood of a breach of the peace was not established. We disagree. It appears to us that the desecration of the flag by burning it in a public place is highly likely to cause a breach of the peace. . . . Violence might have resulted in the case before us if the defendants had not been girls." *Id.* at 827, 292 N.E.2d at 749. Again, the Supreme Court vacated the state court's decision and remanded the case. 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974). It so acted both in light of *Spence* and *Smith*.

Although these summary actions by the Court are not to be accorded the weight of precedent, they are instructive and give indication of the Court's thinking.

> An appeal in which the Supreme Court vacates the judgment and remands the cause for reconsideration in light of another case is not considered at length here, for like many other types of summary dispositions, it is not a final view of the Court on the merits of the case. Nor do such dispositions have intrinsic value as precedent. But such dispositions do suggest an "out" for the Court in certain appeal cases that it would otherwise be obliged to decide summarily or hear fully. The use of an "in light of" reference is usually a citation to a relevant case, recently decided, and unavailable to the lower court at the time of its decision—such as a recent Supreme Court decision. A remand "in light of" such a case gives the lower court another opportunity to resolve the dispute before the Supreme Court is obliged to pass on the merits.

Note, Summary Disposition of Supreme Court Appeals: The Significance of Limited Discretion and a Theory of Limited Precedent, 52 'B.U.L.Rev. 373, 420 (1972). *See also*, R. Stern and E. Gressman, Supreme Court Practice § 5.12 at 220 (4 ed. 1969).

At the least, these decisions demonstrate that the rationale of *Spence* is to be considered applicable in desecration cases and, *Farrell* and *Sutherland* can be viewed, to a limited extent, as supportive of this Court's thesis that possible or hypothetical breaches of the peace are insufficient grounds upon which the abridgment of First Amendment rights can be justified.

62. As Professor Nimmer has stated:
> The state interest in avoiding violent and other unlawful acts is, of course, completely legitimate. But it is not necessarily a non-speech interest, in the sense of an *interest unrelated to meaning effect, i. e.,* the content of the communication. In the context of flag desecration, it is precisely the particular idea conveyed by the act of desecration that it is feared will lead to a violent or unlawful reaction. Thus, insofar as the governmental objective is the suppression of the communication of an idea in order to avoid resulting violence, it is an anti-speech interest, *i. e.,* an interest in the suppression of speech. Applying the foregoing analysis, it follows that if this particular governmental interest is focused upon, flag desecration must be regarded as symbolic speech. This, however, merely establishes that the First Amendment is prima facie applicable. As is well established in verbal speech context, the mere possibility that speech may lead to violent or other unlawful acts does not justify abridgment of that speech. But if such acts can be shown to be both likely and imminent as a result of the speech (whether verbal or symbolic), the speech itself may be suppressed. May it,

venting a breach of the peace cannot be said to arise merely in its assertion.

As Mr. Justice Holmes long ago stated, "[e]very idea is an incitement." [63] So too, every act of flag desecration and every employment of the flag in other than ordinary contexts must be viewed as a provocation, a calling out to others to react and counteract, to express support or disdain. As every expression of ideas may not be trammeled upon in derogation of the First Amendment, so too, conduct regarding the flag, which is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," may not be suppressed solely because it is done or because someone might find the act so reprehensible as to become violent. As has been stated:

a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condi-

tion of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, Chaplinsky v. New Hampshire [315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031] . . . ., is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. [Citations omitted] There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.[64]

So too, New York's undifferentiated fear [65] that the display of the Morrel

then, be concluded that *every* act of flag desecration produces such likelihood and such imminence? Contemporary familiarity with all manner of flag uses, many of which might technically fall afoul of the flag desecration statutes, must surely confirm that not all flag desecration results or is likely to result in violent or unlawful acts. Even in its most provocative form, flag burning, there is not such certainty of reaction. Those in sympathy with the flag burner are as likely to consider his act a culmination of the festivities as they are to consider it a forerunner of more explosive conduct. Those who are offended by flag burning, if they happen to be observers, might be inclined to resort to violent retaliation against the burner, but judging from the not infrequent campus experiences of this sort within the past few years, such retaliatory conduct is very far from certain. Moreover, we then enter the tenuous sphere where speech is suppressed by the government in order to avoid threatened violence not by the speaker or his supporters but by a hostile audience. Though there are some older cases that support this approach, the more recent Supreme Court opinions appear to have narrowed this justification for the suppression of speech, limiting it perhaps to the "fighting words" context *i.*

*e.,* those words "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." It is now clear that "fighting words" are limited to those "personally abusive epithets" which constitute "a direct personal insult." Expression of an unpatriotic point of view, no matter how offensive to the viewer, does not fall within the "fighting words" category.

It may be concluded, then, that the state interest in avoiding violent and other unlawful acts resulting from flag desecration in itself renders flag desecration a form of symbolic speech, and does not justify the suppression of such speech.

Nimmer at 53–55 (footnotes omitted).

63. Gitlow v. New York, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting).

64. Terminiello v. Chicago, 337 U.S. 1, 4–5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). *Compare*, Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951). *See also*, Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (*per curiam*); Tinker v. Des Moines School District, 393 U.S. at 508–509, 89 S.Ct. 733, 21 L.Ed.2d 731.

65. *Compare*, Smith v. United States, 502 F. 2d 512, at 518 (5 Cir. 1974).

constructions in Radich's gallery might provoke a reasonable person to commit unlawful and disruptive acts is insufficient under the Constitution.

While it is not the duty of this Court in the present case to determine the extent of the objective evidence which must be shown before a state may constitutionally suppress an act of flag desecration, whether the anticipated disorder be imminent or probable or whether such potential disorder present a clear and present danger to the public peace,[66] the Court can unhesitatingly state that New York's unsupported assertion that a breach of peace might have resulted from the exhibition of the Morrel constructions, is not a permissible basis for imposition of criminal sanctions.[67] Where the constitutionally guaranteed right to freedom of speech and the free dissemination of ideas, be they popular or unpopular, is to be chilled or abridged, the state must demonstrate more than a mere speculative or hypothetical possibility of disorder; it must present to the trier of facts objective evidence which would lead to the conclusion that, at the very least, a disorder was in fact likely and imminent.

[O]ur task in a given case, and in this case, is to weigh the likelihood of violence against the right of free expression. The danger is that we will overuse "likelihood of violence" in order to be on the safe side. But the framers of the constitutional guarantees must have known they were taking some risk when they inserted the free speech clauses, for many utterances of unpopular ideas are fraught with the possibility of retaliatory action. . . . We must not water down the guarantees by undifferentiated fear or apprehension. *For our part, we will uphold incursions upon symbolic expression on the basis of probable violence only when we are convinced that violence is really probable.*[68]

Our Constitution and the guarantees which are embodied in it are the supreme symbol and law of our nation. Its values and meaning surpass all other symbols and law. In seeking to afford our citizenry the right to speak freely, to assert views which may be unpopular to the majority, and, even, to deprecate those symbols which others hold dear, the framers consciously chose to construct a society and a nation in which the free dissemination of ideas, the thoughts of all free-thinking men, even the smallest dissenting voice, might be heard without fear of prosecution. This is our birthright as Americans. The "freedom to differ is not limited to

---

66. *Compare,* State v. Kool, 212 N.W.2d at 521 *with* People v. Vaughan, 514 P.2d at 1323.

67. Several of the commentators have suggested that flag desecration should be viewed not as a separate crime, but rather as simply one degree or variety of the offenses of breach of peace, disturbing the peace or like crimes. *See, e. g.,* Mittlebecler, *supra* note 23, at 928; Note, 4 Valparaiso U.L.Rev., *supra* note 23, at 357–58. While such a view does not well comport with the position adopted in the opinions of Justices White and Rehnquist in *Smith* and *Spence, see,* n. 45, *supra,* it is worthy of note in light of the strong position adopted by many of the other courts which have accepted preservation of the public peace as the sole justification for suppression of flag-related activity. The legislature of New York might well be advised to re-evaluate the present statute in light of such analysis or, at least, to make comparison of § 136(d) with the federal statute, *see,* n. 1, *supra,* as well as a form of statute which has been formulated by one of the commentators,

No person shall willfully and in public burn, trample upon, tear, or otherwise physically destroy the United States flag or the flag of this State where such act causes a breach of the public peace or where there is an immediate danger of such act causing a breach of the public peace.

Note, 22 Case W.Res.L.Rev., *supra* note 1, at 573–74.

68. State v. Kool, 212 N.W.2d at 521 [emphasis added].

things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." [69] Although such freedom is not absolute, it may not lightly be abrogated.

The flag and that which it symbolizes is dear to us, but not so cherished as those high moral, legal and ethical precepts which our Constitution teaches. When our interests in preserving the integrity of the flag conflict with the higher interest of preserving, protecting and defending the Constitution, the latter must prevail, even when it results in the expression of ideas about our flag and nation which are defiant, contemptuous or unacceptable to most Americans.

For its own part, this Court does not subscribe to the views espoused by the petitioner by means of his display of the Morrel constructions, but his right to express his mind is guaranteed by our Constitution and, on the state of this record, the Court finds no cause for the state's abridgement of that right.

## CONCLUSION

It is the opinion and decision of this Court that the conviction of petitioner, Stephen Radich, in the Criminal Court of the City of New York, as affirmed by the Appellate Courts of the State of New York, served to deprive him of his rights under the First and Fourteenth Amendments to the Constitution of the United States and that § 1425(16)(d) of the New York Penal Law, now § 136(d) of the New York General Business Law, is unconstitutional as applied to him.

Let the writ of habeas corpus issue forthwith upon the submission of an appropriate order.

---

69. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. at 642, 63 S.Ct. at 1187.